CT Corporation

**Service of Process Transmittal**
10/09/2015
CT Log Number 527963517

TO: Jennifer Lauro
The Hanover Insurance Group
440 Lincoln St, N-430
Worcester, MA 01653-0002

RE: **Process Served in District of Columbia**

FOR: The Hanover Insurance Company  (Domestic State: NH)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | BORGER MANAGEMENT INC., Pltf. vs. THE HANOVER INSURANCE COMPANY, Dft. |
| **DOCUMENT(S) SERVED:** | Initial Order and Addendum(s), Sheet(s), Summons, Attachment(s), Complaint(s), Exhibit(s) |
| **COURT/AGENCY:** | Superior Court of the District of Columbia, DC<br>Case # 2015CA007704B |
| **NATURE OF ACTION:** | Breach Of Covenant Of Good Faith And Fair Dealing |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/09/2015 at 13:12 |
| **JURISDICTION SERVED :** | District of Columbia |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Debra Fischer Leege<br>Greenstein DeLorme & Luchs, P.C.<br>1620 L Street, N.W.<br>Suite 900<br>Washington, D.C., WA 20036<br>(202) 452-1400 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/10/2015, Expected Purge Date: 10/15/2015<br><br>Image SOP<br><br>Email Notification,  Service of Process  ogclitmail@hanover.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 1015 15th St NW Ste 1000<br>Washington, DC 20005-2621 |
| **TELEPHONE:** | 202-572-3133 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

BORGER MANAGEMENT INC.

Vs.                                              C.A. No.      2015 CA 007704 B

THE HANOVER INSURANCE COMPANY

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once,** with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge MAURICE ROSS
Date:  October 8, 2015
Initial Conference: 9:00 am, Friday, January 08, 2016
Location:  Courtroom 100
          500 Indiana Avenue N.W.

Caio.doc

# ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

Filed
D.C. Superior Court
11/08/2015 18:30PM
Clerk of the Court

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Borger Management, Inc.

Case Number: __2015 CA 007704 B__

vs

Date: __October 7, 2015__

The Hanover Insurance Company

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Debra Fischer Leege | Relationship to Lawsuit |
| Firm Name: <br> Greenstein DeLorme & Luchs, P.C. | ☒ Attorney for Plaintiff |
| Telephone No.:        Six digit Unified Bar No.: <br> (202) 452-1400              497380 | ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE:  ☒ Non-Jury        ☐ 6 Person Jury        ☐ 12 Person Jury

Demand: $ 200,000 plus costs _____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

## A. CONTRACTS                                    COLLECTION CASES

☒ 01 Breach of Contract
☐ 02 Breach of Warranty
☐ 06 Negotiable Instrument
☐ 07 Personal Property
☐ 13 Employment Discrimination
☐ 15 Special Education Fees

☐ 14 Under $25,000 Pltf. Grants Consent
☐ 17 OVER $25,000 Pltf. Grants Consent
☐ 27 Insurance/Subrogation
     Over $25,000 Pltf. Grants Consent
☐ 07 Insurance/Subrogation
     Under $25,000 Pltf. Grants Consent
☐ 28 Motion to Confirm Arbitration
     Award (Collection Cases Only)

☐ 16 Under $25,000 Consent Denied
☐ 18 OVER $25,000 Consent Denied
☐ 26 Insurance/Subrogation
     Over $25,000 Consent Denied
☐ 34 Insurance/Subrogation
     Under $25,000 Consent Denied

## B. PROPERTY TORTS

☐ 01 Automobile
☐ 02 Conversion
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

☐ 03 Destruction of Private Property
☐ 04 Property Damage

☐ 05 Trespass

## C. PERSONAL TORTS

☐ 01 Abuse of Process
☐ 02 Alienation of Affection
☐ 03 Assault and Battery
☐ 04 Automobile- Personal Injury
☐ 05 Deceit (Misrepresentation)
☐ 06 False Accusation
☐ 07 False Arrest
☐ 08 Fraud

☐ 10 Invasion of Privacy
☐ 11 Libel and Slander
☐ 12 Malicious Interference
☐ 13 Malicious Prosecution
☐ 14 Malpractice Legal
☐ 15 Malpractice Medical (Including Wrongful Death)
☐ 16 Negligence- (Not Automobile,
     Not Malpractice)

☐ 17 Personal Injury- (Not Automobile,
     Not Malpractice)
☐ 18 Wrongful Death (Not Malpractice)
☐ 19 Wrongful Eviction
☐ 20 Friendly Suit
☐ 21 Asbestos
☐ 22 Toxic/Mass Torts
☐ 23 Tobacco
☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_Deb. F. Leeg_
_____
**Attorney's Signature**

October 7, 2015
_____
**Date**

CV-496/ June 2015



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

| | |
|---|---|
| Borger Management, Inc. | |
| 1114 14th Street, NW, Suite 200 | Plaintiff |
| Washington, D.C. 20005 | |

vs.

Case Number  2015 CA 007704 B

The Hanover Insurance Company
Serve:  CT Corporation

1015 15th Street, NW, Suite 1000          Defendant
Washington, D.C. 20005

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Debra Fischer Leege, 497380
Name of Plaintiff's Attorney

Greenstein DeLorme & Luchs, P.C.

Address    1620 L Street, N.W., Suite 900
Washington, D.C. 20036

(202) 452-1400
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date    10/08/2015

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



## TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
### DIVISIÓN CIVIL
**500 Indiana Avenue, N.W., Suite 5000**
**Washington, D.C. 20001 Teléfono: (202) 879-1133**

_____
                                    Demandante

        contra
                                                        Número de Caso: _____

_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                        Por: _____

_____
Dirección
                                                        Subsecretario

_____
                                        Fecha _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오         የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

                                                                        CASUM.doc

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

BORGER MANAGEMENT INC.
1111 14th Street, N.W.
Suite 200
Washington, D.C. 20005

     *Plaintiff,*

v.

THE HANOVER INSURANCE COMPANY
440 Lincoln Street
Worcester, MA 01653
Serve:  CT Corporation
       1015 15th Street, N.W.
       Suite 1000
       Washington, D.C. 20005

     *Defendant.*

Case No. _2015 CA 007704 B_

**COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT,
AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

     Plaintiff, by and through its undersigned counsel, brings this Complaint and states as

follows:

     1.    Plaintiff Borger Management Corporation ("Borger") is a corporation organized

under the laws of the District of Columbia with its principal place of business at 1111 14th Street,

N.W., Suite 200 in Washington, D.C.

     2.    Defendant The Hanover Insurance Company ("Hanover") is a New Hampshire

company, registered in the District of Columbia with the Department of Insurance, Securities and

Banking, and which does business, including issuing policies of insurance, in the District of

Columbia. Defendant's principal place of business is at 440 Lincoln Street in Worcester,

Massachusetts.  Defendant maintains a registered agent in the District of Columbia for service of

process.

　　　3.　　　This Court has jurisdiction of the case pursuant to D.C. Code § 13-423, and venue

is proper pursuant to D.C. Code § 11-921.

　　　4.　　　On September 25, 2014, Hanover issued to Borger, the insured, an insurance

policy providing professional liability insurance for the purpose of property management.  The

policy bears number LHR-A111273-01 (the "Policy").  See Exhibit A, Professional Liability

Policy.  The Policy had a $1,000,000 limit of liability and Borger was responsible for a $10,000

deductible for each claim.

　　　5.　　　Under the Policy, Hanover agreed to cover for Borger's professional services and

was obligated to, among other things:

> pay on your behalf those sums which you become legally obligated
> to pay as damages and claim expenses because of any claim made
> against you arising from a wrongful act in the rendering or failure
> to render professional services by you.

Exhibit A, paragraph A.1.

　　　6.　　　Part of Borger's business is to professionally manage commercial and residential

property owned by third parties in the District of Columbia.  Among the services provided by

Borger as part of its property management, are the following: maintenance of the managed

property; management of budgets, accounts and expenditures for the managed property on behalf

of the property owner; tenant relations/complaints; and collecting the rent.

　　　7.　　　Borger provided property management services to client Buckingham Jenco, LP

("Buckingham") with respect to several properties pursuant to a property management agreement

executed in 2005 (the "Management Agreement").  See Exhibit B, Management Agreement.

2

8.     On June 9, 2015, Borger's Controller, Jennifer Dickey, received an e-mail ostensibly from Martin Jawer, Buckingham's general partner, instructing that $200,000 be wired from Buckingham's account (the "Wire Transfer") the same day for an international payoff. Mr. Jawer is an authorized representative for Buckingham. Mr. Jawer's associate, Carrie Palmer, was copied on the email. See Exhibit C, June 9, 2015 email.

9.     Ms. Dickey responded, advising that a same day wire transfer "would be very easy to do online with Eagle Bank." *Id.* Ms. Palmer responded to Ms. Dickey and confirmed that the funds should be transferred from Eagle Bank and forwarded the wiring instructions. *Id.* Thereafter, Mr. Jawar responded and requested that the Wire Transfer be coded as an owner's expense. The Wire Transfer was sent as instructed to a bank in China on June 9, 2015, notwithstanding the fact that Ms. Dickey did not comply with Borger's internal protocols. *Id.*; see also, Exhibit D, Completed Wire Details.

10.     On June 15, 2015, days after the Wire Transfer, Ms. Dickey received another email from Mr. Jawer, copying Ms. Palmer, requesting the transfer of $410,000. See Exhibit E. Upon receipt of that email, Ms. Dickey became suspicious and investigated further. On first glance, the email addresses appear to be legitimate and accurate based on prior e-mail correspondence received from Mr. Jawar and Ms. Palmer. However, upon further review, although one email address was identical to Ms. Palmer's personal email address, the remaining two email addresses included an additional letter and therefore were not received by Mr. Jawer and Ms. Palmer. Ms. Dickey advised her supervisor, Claudia Good, and the Chairman of Borger, G. Thomas Borger of the discrepancy in the emails and the Wire Transfer.

11.     Upon learning of the Wire Transfer, Ms. Good contacted Eagle Bank to advise of the fraud and request an immediate recall of the Wire Transfer. Eagle Bank initiated the process,

3

but was unsuccessful in retrieving their funds. A Fraud Incident Report was submitted to the Federal Bureau of Investigation for further investigation. Furthermore, a police report was filed with the District of Columbia Cyber Fraud Division.

12.     Borger's network did not cause the security breach or generate the fraudulent email instructions. Instead, during the investigation, it was learned that Ms. Palmer's personal email address had been compromised on June 9, 2015. Although Ms. Palmer was notified by Gmail of the breach, she did not advise Borger of the fraud even though she had used that email address to conduct Buckingham business with Borger.

13.     After learning of the Wire Transfer, Buckingham demanded repayment of the $200,000.

14.     Borger submitted to Defendant on or about June 17, 2015 (the "Claim"), a notice of a claim concerning the incident which was assigned claim number 15-00571124.

15.     On July 1, 2015, Borger's agent, Denise DeShong, contacted Defendant's agent Michael Weber regarding the prospect of Borger replacing the funds in Buckingham's account and to request an assurance from Defendant that such reimbursement would not prejudice the Claim. That same day, Mr. Weber responded that:

> Hanover will not stand in the way of Tom Borger looking to mitigate his exposure by reimbursing Buckingham Jenco for their alleged loss. Mr. Borger's decision to do so is his decision and will not impact our analysis of coverage. At the same time, Hanover cannot at this time, provide Mr. Borger with the assurance he is looking for that Hanover will afford coverage under its policy. Hanover's investigation remains ongoing.

(emphasis added). See Exhibit F, July 1, 2015 email ("July 1 Email").

16.     On July 6, 2015, Borger deposited $200,000 to Buckingham's account to replace the wired funds.

4

527927

17.     Hanover by letter of its counsel dated July 30, 2015, advised that it was denying coverage for the Claim. See Exhibit G, July 30, 2015 Letter from Darcy L. Impach, Esq. to Borger Management, Inc. ("July 30 Letter").  Despite Hanover's prior assurances that Borger's restoration of Buckingham's funds would not prejudice Borger's insurance claim,  Hanover stated it was denying coverage because (i) Borger had reimbursed Buckingham and had done so "at its own peril;" (ii) it believed that Borger was not obligated to repay Buckingham pursuant to paragraph 13 of the Management Agreement; and (iii) the Wire Transfer constituted improper use of funds by Borger which was activity excluded from coverage under Exclusion 17 of the Policy.  Specifically, Exclusion 17 of the Policy provides that the Policy does not apply to claims: "Arising out of or resulting, directly or indirectly, from any actual or alleged commingling, misappropriation or improper use of funds or monies[.]"  Exhibit A.

18.     With respect to paragraph 13 of the Management Agreement, Hanover asserted that such paragraph provided a defense to Borger because Borger and Buckingham agreed that 'neither party shall be liable to the other for, and each party waives any and all rights to claim against the other party...."  Hanover asserted that by reimbursing Buckingham, Borger prejudiced Hanover by waiving that defense. Exhibit G.

19.     On August 14, 2015, Borger, by counsel, responded to the July 30 Letter. Exhibit H, August 14, 2015 Letter from William C. Casano, Esq. to Darcy L. Imbach, Esq. ("August 14 Letter").  In that letter, Borger pointed out to Hanover and provided caselaw to the effect that Borger did not use the $200,000 for its own purposes or in any way misappropriates or improperly use the funds.  Instead, it was defrauded out of those funds by a cyber-scam operated out of China, even though it appeared that it was receiving instructions from its client. *Id.* Furthermore, Borger had not waived any defenses or operated at its own peril as it had obtained

5

an assurance from Hanover that it "will not stand in the way of Tom Borger looking to mitigate his exposure by reimbursing Buckingham Jenco" and doing so, "will not impact our analysis of coverage." *Id.*, quoting the July 1 Email. As such, Hanover's later denial of the Claim for that reason was disingenuous and therefore must be reconsidered.

20.     With respect to Hanover's denial of coverage based on the Management Agreement, Borger pointed out that Hanover was mistaken in its interpretation of paragraph 13. The last paragraph of Paragraph 13 of the Management Agreement states:

> In addition, neither party shall be liable to the other for, and each
> party waives any and all rights to claims against the other party,
> any special, indirect, incidental, punitive, consequential,
> speculative or exemplary damages in connection with this
> Agreement, including, but not limited to, lost revenue or profits,
> even if a party has knowledge of the possibility of such damages.

Exhibit B. Thus, although Borger and Buckingham waived the right to extraordinary damages such as punitive damages, exemplary damages, special damages and consequential damages such as lost revenue or profits, there is no waiver of compensatory damages.   Furthermore, Borger reminded and provided caselaw supporting the conclusion that "a waiver of future gross misconduct is unenforceable as against public policy." Exhibit H.

21.     Hanover's counsel responded to the August 14 Letter by letter dated September 11, 2015. In that response, Hanover expanded upon some of its earlier assertions as well as added some additional grounds for denial of coverage. Exhibit I, September 11, 2015 Letter from Darcy L. Imbach, Esq. to William C. Casiano, [sic] Esq. ("September 11 Letter").

22.     Specifically, Hanover stated the following:

(a)     Restoration of Funds. Hanover criticized Borger because it restored Buckingham's funds without doing so under a reservation or rights nor by placing the

6

funds in escrow, notwithstanding the fact that Hanover suggested no such precautions when it advised Borger that repayment of funds would not prejudice the claim.

(b)    Reimbursement of Funds. Hanover added a new basis for denial of coverage and characterized the Claim as a "return of funds" for a breach of contract and excluded under 13 of the Policy. However, Exclusion 13 of the Policy provides that the Policy does not apply to claims: "Arising out of liability you assume under any contract or agreement; however, this exclusion does not apply to liability you would have in absence of such contract or agreement." Exhibit A.

(c)    Misuse of Funds. Hanover continued to rely on Exclusion 17 and provided Borger with case law Hanover asserted supported the position that misdirection of funds constituted misappropriation and misuse of funds thereby triggering Exclusion 17. However, the case law cited by Hanover represents a minority view which has been soundly criticized.

23.    Despite Borger's efforts, Hanover has failed to change its decision to deny the Claim. Through its actions, Hanover has made it clear that it will use any flimsy basis to deny its obligations under the Policy.

<u>Count I</u>
<u>For Declaratory Judgment</u>

24.    Plaintiff incorporates by reference the allegations of paragraphs 1-23 as if fully stated herein.

25.    This is an action for a declaratory judgment. An actual controversy of a justiciable nature exists between Plaintiff and Defendant involving the meaning of the Policy and how it applies in light of the Claim.

7

527927

26.     Plaintiff has no adequate remedy at law and is entitled to specific performance. The Policy clearly covers the loss sustained by Borger from the cyber-fraud, yet Hanover steadfastly refuses to interpret its Policy accordingly and instead relies upon inapplicable Exclusions or on grounds (e.g. payment of the claim by Borger) which Hanover has waived or should be estopped to assert.

27.     Plaintiff has suffered and will continue to suffer harm as a result of Defendant's conduct.

WHEREFORE, Plaintiff requests that this Court grant the following relief as to Count I.

(a)     A judicial declaration that that the Claim is within the coverage of the Policy;

(b)     A judicial declaration that Defendant has a duty under the Policy to pay the Claim;

(c)     A judicial declaration that Defendant wrongfully refused to pay the Claim;

(d)     A judgment in favor of Plaintiff in the amount of $200,000, which is the amount of the Claim;

(e)     Such other relief as the Court deems just and proper.

**Count II**
**Breach Of Contract**

28.     Plaintiff incorporates by reference paragraphs 1-27 as if fully stated herein.

29.     Plaintiff gave Defendant timely notice of the Claim.

30.     The allegations of the Claim stated a claim covered by the Policy.

31.     Defendant breached the contract with Plaintiff by failing to pay the Claim.

32.     Defendant's actions in breaching the insurance agreement has and will continue to cause damage to Plaintiff in that it has had to pay for the restoration of client funds and it has

8

paid and will continue to pay the costs of prosecuting this lawsuit in order to receive the coverage it is entitled to under the Policy.

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against Defendant as to Count II for compensatory damages in the amount of the Claim, together with the costs of this litigation, and any other relief this Court deems just and proper.

Count III
Breach Of Covenant Of Good Faith And Fair Dealing

33.     Plaintiff incorporates by reference paragraphs 1-32 as if fully stated herein.

34.     District of Columbia law imposes on Defendant a duty of good faith and fair dealing with respect to the Policy and the contract between the parties.

35.     Defendant breached this duty by refusing to pay the Claim on grounds that Defendant knew or should have known were invalid and not based upon a reasonable interpretation of the Policy or applicable law.  Defendant purposely failed to perform its obligations under the Policy and its conduct had the effect of destroying or injuring the right of Plaintiff to receive the fruits of the Policy.

36.     Defendant further breached this duty by denying the claim due to the reimbursement to Buckingham after advising that payment to Buckingham would not prejudice Borger's claim.

37.     Defendant's conduct was arbitrary, capricious, and in bad faith.

38.     As a direct and proximate result of Defendant's conduct, Plaintiff has been injured.  In this regard, Plaintiff has suffered compensatory damages of $200,000 and will continue to suffer consequential damages.

WHEREFORE, Plaintiff asks that this Court enter judgment in their behalf and against Defendant as to Court IV for compensatory damages of $200,000 and for consequential damages

9

527927

in an amount to be determined at trial, Plaintiff's costs, and for whatever other relief this Court

deems just and proper.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated:  October 7, 2015

Richard W. Luchs (D.C. Bar No. 243931)
William C. Casano (D.C. Bar No. 352492)
Debra F. Leege (D.C. Bar No. 497380)
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
E-mail:  dfl@gdllaw.com

*Counsel for Plaintiff*

10

527927

# EXHIBIT A



# Privacy Policy and Producer Compensation Practices Disclosures
## *Privacy Policy Disclosure*

### Collection of Information

We collect personal information so that we may offer quality products and services. This information may include, but is not limited to, name, address, Social Security number, and consumer reports from consumer reporting agencies in connection with your application for insurance or any renewal of insurance. For example, we may access driving records, insurance scores or health information. Our information sources will differ depending on your state and/or the product or service we are providing to you. This information may be collected directly from you and/or from affiliated companies, non-affiliated third parties, consumer reporting agencies, medical providers and third parties such as the Medical Information Bureau.

### Disclosure of Information

We may disclose non-public, personal information you provide, as required to conduct our business and as permitted or required by law. We may share information with our insurance company affiliates or with third parties that assist us in processing and servicing your account. We also may share your information with regulatory or law enforcement agencies, reinsurers and others, as permitted or required by law.

Our insurance companies may share information with their affiliates, but will not share information with non-affiliated third parties who would use the information to market products or services to you. We do not share the non-public personal information of customers of our SEC regulated companies or customers who own products of ours which are SEC regulated with affiliated or non-affiliated companies who would use that information to market products or services to you.

Our standards for disclosure apply to all of our current and former customers.

### Safeguards to Protect Your Personal Information

We recognize the need to prevent unauthorized access to the information we collect, including that held in an electronic format on our computer systems. We maintain physical, electronic and procedural safeguards intended to protect all non-public, personal information.

### Internal Access to Information

Access to personal, nonpublic information is limited to those people who need the information to provide our customers with products or services. These people are expected to protect this information from inappropriate access, disclosure and modification.

### Consumer Reports

In some cases, we may obtain a consumer report in connection with an application for insurance. Depending on the type of policy, a consumer report may include information about you or your business, such as:

- character, general reputation, personal characteristics, mode of living;
- credit history, driving record (including records of any operators who will be insured under the policy); and/or
- an appraisal of your dwelling or place of business that may include photos and comments on its general condition.

### Access to Information

Upon written request, we will inform you if we have ordered an investigative consumer report. You have the right to make a written request within a reasonable period for information concerning the nature and scope of the report and to be interviewed as part of its preparation. You may obtain a copy of the report from the reporting agency and, under certain circumstances; you may be entitled to a copy at no cost.

You also may review certain information we have about you or your business in our files. To review information we maintain in our files about you or your business, please write to us, providing your complete name, address and policy number(s), and indicating specifically what you would like to see. If



you request actual copies of your file, there may be a nominal charge.
We will tell you to whom we have disclosed the information within the two years prior to your request. If there is not a record indicating that the information was provided to another party, we will tell you to whom such information is normally disclosed.

There is information that we cannot share with you.  This may include information collected in order to evaluate a claim under an insurance policy, when the possibility of a lawsuit exists.  It may also include medical information that we would have to forward to a licensed medical doctor of your choosing so that it may be properly explained.

### *Correction of Information*

If after reviewing your file you believe information is incorrect, please write to the consumer reporting agency or to us, whichever is applicable, explaining your position.  The information in question will be investigated.  If appropriate, corrections will be made to your file and the parties to whom the incorrect information was disclosed, if any, will be notified.  However, if the investigation substantiates the information in the file, you will be notified of the reasons why the file will not be changed.  If you are not satisfied with the evaluation, you have the right to place a statement in the file explaining why you believe the information is incorrect.  We also will send a copy of your statement to the parties, if any, to whom we previously disclosed the information and include it in any future disclosures.

### *Our Commitment to Privacy*

In the insurance and financial services business, lasting relationships are built upon mutual respect and trust. With that in mind, we will periodically review and revise our privacy policy and procedures to ensure that we remain compliant with all state and federal requirements .  If any provision of our privacy policy is found to be non-compliant, then that provision will be modified to reflect the appropriate state or federal requirement.  If any modifications are made, all remaining provisions of this privacy policy will remain in effect.  For more detailed information about our privacy policy, visit our Web site, located at www.hanover.com.

### *Producer Compensation Disclosure*

Our products are sold through independent agents and brokers, often referred to as "Producers." We may pay Producers a fixed commission for placing and renewing business with our company.  We may also pay additional commission and other forms of compensation and incentives to Producers who place and maintain their business with us.    Details of our Producer compensation practices may be found at www.hanover.com .

### *Further Information*

If you have questions about our privacy policy, or if you would like to request information we have on file, please write to us at our Privacy Office, N435, The Hanover Insurance Group, Inc., 440 Lincoln Street, Worcester, MA 01653. Please provide your complete name, address and policy number(s).  A copy of our Producer Compensation Disclosure is also available upon written request addressed to the attention of the Corporate Secretary, N435, The Hanover Insurance Group, 440 Lincoln Street, Worcester, MA 01653.

This notice is being provided on behalf of the following Hanover Companies: The Hanover Insurance Group, Inc. - Allmerica Financial Alliance Insurance Company - Allmerica Financial Benefit Insurance Company  - Allmerica Plus Insurance Agency, Inc. -  Citizens Insurance Company of America - Citizens Insurance Company of Illinois - Citizens Insurance Company of the Midwest – Citizens Insurance Company of Ohio - Citizens Management, Inc. - AIX  Ins. Services of California, Inc.- Benchmark Professional Insurance Services, Inc.- Campania Insurance Agency Co. Inc.- Campmed Casualty & Indemnity Co. Inc - Chaucer Syndicates Limited- Educators Insurance Agency, Inc.- Hanover Specialty Insurance Brokers, Inc. - The Hanover American Insurance Company - The Hanover Insurance Company - The Hanover New Jersey Insurance Company - The Hanover National Insurance Company - Hanover Lloyd's Insurance Company - Massachusetts Bay Insurance Company - Opus Investment Management, Inc. - Professionals Direct Insurance Company - Professionals Direct Insurance Services, Inc. -Professional Underwriters Agency, Inc.- Verlan Fire Insurance Company - Nova Casualty Company - AIX Specialty Insurance Company

 **The Hanover** Insurance Group

**Hanover Professionals**
**DECLARATIONS** **Advantage Portfolio**

*THIS IS A CLAIMS-MADE POLICY. PLEASE READ THE POLICY CAREFULLY.*

## MISCELLANEOUS PROFESSIONAL LIABILITY POLICY

| Policy Number | Coverage is provided by: | Agency | Agency Code |
|---|---|---|---|
| LHR A111273 01 | HANOVER INSURANCE COMPANY | WILLIS OF MARYLAND INC | 3002766 |

**Issue Date:**     09/25/2014

**Item 1. Named Insured and Address:**

    BORGER MANAGEMENT INC
    1111 14TH ST N W #200
    WASHINGTON, DC 20005

**Item 2. Policy Period:**

    Inception Date: 09/20/2014
    Expiration Date: 09/20/2015
    12:01 A.M. Standard Time at the address
    of the Named Insured as stated herein

**Item 3. LIMIT OF LIABILITY**
Limit of Liability

    a. $1,000,000 for each **Claim**; not to exceed
    b. $1,000,000 for all **Claims** in the aggregate

**Item 4. DEDUCTIBLE:**     $10,000 Each Claim

**Item 5. RETROACTIVE DATE:** 08/20/2007

**Item 6. PROFESSIONAL SERVICES**
PROPERTY MANAGEMENT

**Item 7. PREMIUM FOR THE POLICY PERIOD:**

    Total Coverage Premium: $13,771.00
    State Surcharge and Tax: (if applicable)
    State Guaranty Fund:     $0.00 (if applicable)
    Total Premium: $13,771.00

**Item 8. NOTICE OF A CLAIM**
Report any claim to the Company as required by Section **G. DUTIES IN THE EVENT OF CLAIM(S) OR POTENTIAL CLAIM(S):**

The Hanover Insurance Company
P.O. Box 15145
Worcester, MA 01615

**National Claims Telephone Number:** 800-628-0250
**Facsimile:** 800-399-4734
**Email:** firstreport@hanover.com

**Item 9.** Forms attached at issue:

| | | |
|---|---|---|
| 401-1268 | (08-12) | U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders |
| 910-0001 | (12-09) | Miscellaneous Professional Liability Insurance Policy |
| 910-0079 | (01-12) | Property Management Endorsement |
| 910-0111 | (11-09) | District of Columbia Miscellaneous Professional Liability Amendatory Endorsement |

| 910-0140 | (10-11) | Notice to Policyholders: Information Regarding Extended Reporting Period ("ERP Coverage") |
| 910-0198 | (01-12) | Fair Housing Act Coverage Endorsement |
| 910-0706 | (01-12) | Limited Construction Property Management Endorsement |
| 910-0707 | (01-12) | Limited Discrimination Coverage Endorsement - Professional Services |
| 910-0708 | (01-12) | Lock Box Coverage Endorsement |
| SIG-1100 | (08-14) | Signature Page |

**Item 10.** Producer Name and Address:  WILLIS OF MARYLAND INC
12505 PARK POTOMAC AVE POTOMAC MD 20854



## U.S. TREASURY DEPARTMENT'S
## OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

## ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this policyholder notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this notice carefully.**

The Office of Foreign Assets Control ("OFAC") administers and enforces sanctions policy, based on Presidential Declarations of National Emergency.

OFAC has identified and listed numerous foreign agents, front organizations, terrorists, terrorists organizations, and narcotic traffickers as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site: http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated United States sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

Other limitations on the premiums and payments also apply.

**MISCELLANEOUS PROFESSIONAL LIABILITY INSURANCE POLICY**

**TABLE OF CONTENTS**

A.  COVERAGE – WHAT THIS POLICY INSURES ............................................................. 2
B.  DEFENSE AND SETTLEMENT (INCLUDED IN THE LIMIT OF LIABILITY) ...................................... 3
C.  LIMIT OF LIABILITY AND DEDUCTIBLE .................................................................. 3
    1.  LIMIT OF LIABILITY ............................................................................. 3
    2.  DEDUCTIBLE ..................................................................................... 3
    3.  REIMBURSEMENT ................................................................................. 3
D.  DEFINITIONS ........................................................................................ 3
E.  EXCLUSIONS - WHAT THIS POLICY DOES NOT INSURE ....................................................... 6
F.  EXTENDED REPORTING PERIOD .......................................................................... 7
G.  DUTIES IN THE EVENT OF CLAIM(S) OR POTENTIAL CLAIM(S) .............................................. 8
H.  CONDITIONS ......................................................................................... 8
    1.  CANCELLATION AND NON RENEWAL .................................................................. 8
    2.  REPRESENTATIONS AND APPLICATION ............................................................... 9
    3.  LEGAL ACTION AGAINST US ....................................................................... 9
    4.  CHANGE IN OWNERSHIP, CONTROL OR EXPOSURE ...................................................... 9
    5.  TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US .......................................... 10
    6.  ASSIGNMENT .................................................................................... 10
    7.  SOLE AGENT FOR THE INSURED ................................................................... 10
    8.  COVERAGE TERRITORY AND VALUATION ............................................................. 10
    9.  OTHER INSURANCE .............................................................................. 10
    10. TWO OR MORE POLICIES, COVERAGE PARTS, OR ENDORSEMENTS ISSUED BY US .. 11
    11. ALLOCATION .................................................................................... 11
    12. SEPARATION OF INSUREDS ....................................................................... 11
    13. CONFORMANCE TO STATUTE ........................................................................ 11
    14. SECTION TITLES ............................................................................... 11
    15. BANKRUPTCY .................................................................................... 11
    16. LIBERALIZATION ............................................................................... 11

# MISCELLANEOUS PROFESSIONAL LIABILITY INSURANCE POLICY

This is a **CLAIMS-MADE AND REPORTED** policy. Subject to the terms, conditions, exclusions and limitations of this policy, coverage is limited to liability for only those **claims** that are first made against **you** and reported to **us** in writing after the retroactive date and during the **policy period** or any optional extended reporting period, if exercised by **you**.

This is a "defense within limits" policy with **claim expenses** included within the limit of liability. The limit of liability available to pay **damages** will be reduced by amounts **we** pay for **claim expenses** as defined in the policy. Further note that amounts incurred for **claim expenses** and **damages** are subject to the deductible.

Please read this policy carefully.

Throughout this **policy**, the terms **we**, **us** and **our** refer to the **Company** providing this insurance. The terms **you** and **your** refer to the persons and entities insured under this **policy**. Other terms in bold print have special meaning and are defined in the **policy**.

## A. COVERAGE – WHAT THIS POLICY INSURES

1. Professional Services Coverage

   **We** will pay on **your** behalf those sums which **you** become legally obligated to pay as **damages** and **claim expenses** because of any **claim** made against **you** arising from a **wrongful act** in the rendering or failure to render **professional services** by **you**.

   The following additional requirements and limitations shall apply to coverage provided under A.1 above and A.3. and A.4. below:

   a. The **wrongful act** must have first occurred on or after the applicable **retroactive date(s)**;

   b. **You** had no knowledge of facts which could have reasonably caused **you** to foresee a **claim**, or any knowledge of the **claim**, prior to the effective date of this **policy**; and,

   c. The **claim** must first be made and reported to **us** in writing during the **policy period** or any **extended reporting period**, if applicable, and must arise from any **wrongful act** to which this **policy** applies.

2. Disciplinary Proceedings Coverage

   **We** will pay on **your** behalf only **defense expenses** incurred in responding to a **disciplinary proceeding** commenced against **you** and reported to **us** in writing during the **policy period**, or which was commenced during the **policy period** and, if exercised, reported to **us** in writing during any optional **extended reporting period**. The maximum amount available for **defense expenses** for a **disciplinary proceeding** is $25,000 for each **policy period**, regardless of the number of **disciplinary proceedings**. Any payment made hereunder shall not be subject to the deductible and shall not reduce any applicable limit of liability. Inclusive within this coverage, **we** will pay up to $250 per day for any salaries and expenses of **your** employees required to attend or participate in any **disciplinary proceeding**. **We** shall not pay any **damages** incurred as a result of **disciplinary proceedings**.

3. Personal Injury Coverage

   **We** will pay on **your** behalf those sums which **you** become legally obligated to pay as **damages** and **claim expenses** because of any **claim** made against **you** and reported to **us** in writing during the **policy period**, or any **extended reporting period**, if applicable, that arise from **your professional services** and are for:

   a. **Your** defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress or other tort related to disparagement or harm to the reputation or character of any person or entity;

   b. **Your** invasion or interference with the right to privacy or publicity, including but not limited to false light, public disclosure of private facts, intrusion and invasion; or

   c. **Your** causing a third party to be subject to false arrest, detention or imprisonment.

4. Technology Professional Coverage

   **We** will pay on **your** behalf those sums which **you** become legally obligated to pay as **damages** and **claim expenses** because of any **claim** arising from **your professional services** and made against any **insured** and reported to **us** in writing during the **policy period**, or any **extended reporting period**, if applicable, that arises from:

a.   The inability of an authorized third party to gain access to **computer services;**

b.   **Unauthorized access** to **computer services** that results in:

  1)   The destruction, deletion or corruption of electronic data on **computer services;** or

  2)   Denial of service attacks against **computer services** or transmission of **malicious code** to **computer services.**

## B.   DEFENSE AND SETTLEMENT (INCLUDED IN THE LIMIT OF LIABILITY)

**We** have the right to investigate and the exclusive right to defend any **claim** made under this **policy,** even if the allegations are groundless, false or fraudulent until there is a final adjudication against **you. We** are not obligated to defend any criminal investigation, criminal proceeding or prosecution against **you.** If a **claim** is not covered under this **policy, we** will have no duty to defend it.

Payment of **claim expenses** will reduce the amounts available to pay **damages. Our** duty to defend any **claim** or pay any amount as **damages** or **claim expenses** will cease when **our** limit of liability has been exhausted. Upon exhaustion of the limits of liability, **we** will tender control of the defense to the **named insured.** The **named insured** agrees to accept this tender of defense.

**We** will not settle a **claim** without the consent of the **named insured.** If the **named insured** refuses to consent to a settlement **we** recommend and which a claimant would accept, then **our** liability for the **claim** will not exceed the amount for which **we** would have been liable for **damages** if the **claim** had been settled as recommended by **us** and acceptable to the claimant, including **claim expenses** incurred up to the date of the **named insured's** refusal. After the time of the **named insured's** refusal, the **named insured** shall be responsible for all **damages** in excess of the amount for which the **claim** could have been settled, and all **claims expenses** incurred thereafter. For the purpose of this section, settlement includes, but is not limited to, any resolution of a **claim** that would have occurred as a result of any court-ordered process which the **named insured** chose not to accept.

The **named insured** is responsible for any fees or costs charged by a lawyer defending **you** or any other defense expenses incurred without **our** written consent.

## C.   LIMIT OF LIABILITY AND DEDUCTIBLE

### 1.   LIMIT OF LIABILITY

The limit of liability per claim limit shown on Item **3.a** of the Declarations page is the most we will pay for the sum of all **damages** and **claim expenses** arising out of a single **claim** or a series of related **claims,** regardless of the number of persons or entities insured under this policy, number of **claims** made or the number of persons or entities making claims during the **policy period** or during any **extended reporting period,** if any.

The **Aggregate** limit shown on Item **3.b** of the Declarations page is the most we will pay for the sum of all **damages** and **claim expenses** for all **claims** under this policy.

### 2.   DEDUCTIBLE

a.   **You** will pay the deductible amount shown in the Declarations. The deductible applies to each **claim. We** will not be required to make any payment for **claim expenses,** settlements reached, or judgments rendered in an otherwise covered **claim** unless and until **you** have paid the deductible in full. **You** must pay the deductible (i) immediately when invoiced or, (ii) in the event that offers of judgment or settlement demands are made which **you** and **we** agree should be accepted, prior to the expiration of the time period for responding to such offers or demands.

b.   All **claim expenses** will first be subtracted from the limit of liability, with the remainder, if any, being the amount available to pay for **damages** after **you** have paid the deductible in paragraph **a.**

c.   If **you** and **we** agree to use **mediation** to resolve any **claim** brought against **you** and if the **claim** is resolved by **mediation, your** deductible obligation for that **claim** will be reduced by 50%.

### 3.   REIMBURSEMENT

In the event that **we** voluntarily choose or are compelled by a court of law to make any payment of the deductible and request reimbursement from **you,** the reimbursement is payable immediately, but no later than thirty (30) days after written demand.

## D.   DEFINITIONS

**Acts of Terrorism** means activities against persons, organizations or property of any nature:

1.   That involve the following or preparation for the following:

a) Use or threat of an act that interferes with or disrupts electronic, communication, information, or Use or threat of force or violence; or

b) Commission or threat or a dangerous act; or

c) Commission or threat of an act that interferes with or disrupts electronic, communication or mechanical systems; and

2. When one or both of the following apply:

a) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

b) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or to express opposition to) a philosophy or ideology.

To qualify as an **act of terrorism**, the act must be determined by a governmental official or governmental authority to be an **act of terrorism** or cyber terrorism or that it was committed by a terrorist or cyber terrorist.

**Bodily Injury** means physical injury, sickness or disease and, if arising out of the foregoing, mental anguish, emotional distress, mental injury, shock, humiliation or death at any time.

**Claim** means a written demand or **suit you** receive.

**Claim expenses** means all expenses **we** incur or authorize in writing for the investigation, adjustment, defense or appeal of a **claim**. These expenses include fees charged by a lawyer, mediator or arbitrator with **our** consent for which **you** are obligated. **Claim expenses** also mean:

1. The premium on appeal, attachment or similar bond; and

2. Up to $250 per day per insured for supplemental payment for reasonable expenses incurred for attendance at hearings, trials, or depositions at **our** request or with our consent by such **insured**. Such payment shall not exceed $5,000 in the aggregate for all **insureds** in each **claim**.

**Claim expenses** do not include salaries, wages, fees, overhead or benefit expenses associated with:

3. Any **insured** except as specified in subparagraph 2. above; or

4. **Our** employees.

**Company** means the insurance company that issued this policy, as shown on the Declarations page or referred to herein as **we, us,** or **our**.

**Computer services** means computers and associated input and output devices, data storage devices, networking equipment, backup facilities, and internet sites operated by and either owned by or leased by any third party for whom **you** provide **professional services**.

**Damages** means monetary judgments, awards or settlements unless otherwise excluded. **Damages** includes (i) pre-judgment interest; and (ii) post judgment interest that accrues after entry of judgment and before **we** have paid, offered to pay or deposited in court that part of judgment within the applicable limit of liability.

**Damages** also means punitive or exemplary **damages** or the multiple portions thereof, if insurable under the applicable law of the jurisdiction most favorable to the insurability of such **damages** provided such jurisdiction is where:

1. Those **damages** were awarded or imposed; or

2. Any **wrongful act** occurred for which such **damages** were awarded or imposed;

3. The **named insured** resides, is incorporated or has its principal place of business; or

4. **We** are incorporated or have our principal place of business.

**Damages** do not include any costs or expenses in complying with any demand for or award of **equitable relief**, even if such compliance is compelled as a result of a judgment, award or settlement.

**Defense expenses** means all expenses **you** incur in investigation, defense or appeal of any **disciplinary proceeding**.

**Disciplinary proceeding** means any proceeding by a disciplinary official or agency to investigate or prosecute charges alleging professional misconduct in the performance of **your professional services**.

**Domestic partner** means any natural person granted legal status as a domestic partner under any applicable federal, state or local law or under the provisions of any formal program established by the **named insured**.

Case 1:15-cv-01958-CKK   Document 1-1   Filed 11/05/15   Page 28 of 110

**Employment practices** means any actual or alleged:

1. Wrongful termination of the employment of, or demotion of, or failure or refusal to hire or promote any person in violation of law or in breach of any agreement to commence or continue employment;

2. Unlawful employment discrimination;

3. Sexual harassment of an employee or applicant for employment; or

4. Retaliatory treatment against an employee on account of that employee's exercise or attempted exercise of his or her rights under law.

**Equitable relief** means a remedy not involving the payment of monetary damages.

**Extended reporting period** means an additional period of time for reporting **claim(s)**. The **extended reporting period** starts on the **policy termination date** and ends at the **extended reporting period** expiration date.

**First inception date** means the inception date of the first Miscellaneous Professional Liability **policy** issued by **us** to the **named insured** and continually renewed by **us** until the inception date of this current **policy**.

**Insured** means:

1. The **named insured**; and:

2. If **you** are a sole proprietorship, any past or present employee of **yours**, but only while acting on **your** behalf in their capacity as an employee;

3. If **you** are a partnership, any past or present general or managing partner, principal or employee of **yours**, but only while acting on **your** behalf in such capacity;

4. If **you** are a limited liability company, any past or present managing member, principal or employee of **yours**, but only while acting on **your** behalf in such capacity;

5. If **you** are a corporation, any past or present officer, director, trustee, or employee of **yours**, but only while acting on **your** behalf in such capacity;

6. **Your** temporary or leased employees, but only while acting on **your** behalf as an employee;

7. If **you** are a **subsidiary** of the **named insured, you** are only covered while acting on behalf of the **named insured**;

8. **Your** lawful spouse or **domestic partner**, solely for liability arising from any **wrongful act** of an **insured** committed without the participation of such spouse or **domestic partner**;

9. **Your** heirs, assigns and legal representatives in the event of **your** death, incapacity or bankruptcy to the extent that **you** would have been covered; or,

10. An independent contractor for **claims** and **damages** under **Section A.1, 3, or 4,** but only while acting on **your** behalf  and only if there is a signed agreement executed by the **named insured and** the independent contractor which:

    a) Specifies the services to be performed by the independent contractor on the **named insured's** behalf;

    b) Provides that the services performed by the independent contractor will be under the **named insured's** supervision;

    c) States that the independent contractor will be indemnified by the **named insured** for the services performed on the **named insured's** behalf; and,

    d) Is entered into before the **wrongful act** which leads to a **claim** or **potential claim.**

**Loss** means **claim expenses, damages** and defense expenses and does not include **equitable relief.**

**Malicious code** means any virus, trojan horse, worm or similar software program, code or script intentionally designed to insert itself into computer memory.

**Mediation** means the non-binding intervention of a qualified neutral third party chosen by **you** and the other party to a **claim** with agreement by **us**.

**Named insured** means the individual, entity, partnership, or corporation designated as such in the Declarations page.

**Policy** means this **policy** form, the Declarations, and any endorsement to the **policy** issued by **us,** and **your** application, including all supplements.

**Policy period** means the period from the effective date of the **policy** to the expiration date or earlier termination date of the **policy**.

**Policy termination date** means the expiration date of the **policy** as shown on the Declarations page or the cancellation date of the **policy**, whichever is earlier.

**Pollutants** include, but are not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, asbestos, acids, alkalis, chemicals, and waste. Waste includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

**Potential claim** means any **wrongful act** or any facts or other circumstances which may subsequently give rise to a **claim**.

**Professional services** means those services described in Item **6.** of the Declarations which **you** perform for others for a fee.

**Property damage** means (1) physical injury to, loss or destruction of, tangible property including the resulting loss of use thereof; or (2) loss of use of tangible property which has not been physically injured or destroyed.

**Retroactive date(s)** refer to the dates shown in Item **5.** of the Declarations. If no date is shown on the Declarations page the retroactive date will be inception date of the policy.

**Subsidiary** means any corporation:

1. Identified by **you** in the application for this **policy**, of which the **named insured** owns more than fifty percent (50%) of the issued and outstanding voting stock either directly or indirectly on the inception date of the **policy period**; or

2. Which becomes a **subsidiary** during the **policy period** provided that such corporation does not represent more than a ten percent (10%) increase in the total assets or gross revenue of the **named insured** as of the date of the acquisition. Where such corporation represents an increase in the total assets or gross revenue of the **named insured** of more than ten percent (10%), such corporation shall be deemed a **subsidiary** under the **policy**, but only upon the condition that within ninety (90) days of its becoming a **subsidiary**, **you** shall have provided **us** with full particulars of the new **subsidiary** and agree to any additional premium and/or amendment of the provisions of this **policy** required by **us** relating to such new **subsidiary**, subject to the review and acceptance by **us** of full and complete underwriting information. Further, coverage as shall be afforded to the new **subsidiary** is conditioned upon the **named insured** paying when due any additional premium required by **us** relating to such new **subsidiary**. A corporation becomes a **subsidiary** when the **named insured** owns more than fifty percent (50%) of the issued and outstanding voting stock either directly or indirectly, and ceases to be a **subsidiary** at such time when the **named insured** ceases to own more than fifty percent (50%) of the issued and outstanding voting stock.

**Suit** means a civil proceeding for monetary, non-monetary or injunctive relief, which is commenced by service of a complaint or similar pleading. **Suit** includes a binding arbitration proceeding in which **damages** are alleged and to which **you** must submit or do submit with **our** consent.

**Unauthorized access** means the use of or access to **computer systems** by a person not authorized to do so by the **Named Insured**; or the use or access to **computer systems** in a manner not authorized by the **named insured**.

**Wrongful act** and **wrongful acts** means any actual or alleged negligent act, error, omission, or misstatement committed in **your professional services**.

E. **EXCLUSIONS - WHAT THIS POLICY DOES NOT INSURE**

This **policy** does not apply to **claim**(s)

1. Cased upon, arising out of, or in any way relating directly or indirectly to any **insured**:

   a) Committing any intentional, dishonest or fraudulent act or omission; or

   b) Gaining any profit, remuneration or advantage to which such **insured** was not legally entitled,

   provided that this exclusion will not apply until a final adjudication establishes **a)** or **b)** above;

2. For any willful or criminal violation of any statute, rule or law;

3. For the return, restitution or reduction of professional fees or arising from any demand for **equitable relief;**

4. Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time;

5.  Arising out of **acts of terrorism**;

6.  Arising out of **bodily injury** or **property damage**;

7.  Arising out of:

    a)  Any purchase, sale, or offer or solicitation of an offer to purchase or sell securities;

    b)  Any violation of any securities law, including the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any regulation promulgated under the foregoing statutes, or any federal, state or local laws similar to the foregoing statutes (including "Blue Sky" laws), whether such law is statutory, regulatory or common law; or

    c)  Any violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act, or "RICO"), as amended, or any regulation promulgated thereunder or any federal, state or local law similar to the foregoing, whether such law is statutory, regulatory or common law;

8.  Arising out of any breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan, including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, or similar statutory or common law of the United States of America or any state or jurisdiction therein;

9.  Arising out of any **employment practices** liability or any discrimination on any basis, including, but not limited to: race, creed, color, religion, ethnic background, national origin, age, handicap, disability, gender, sexual orientation or pregnancy;

10. Arising out of any misappropriation or misuse of trade secret or infringement of patent, copyright, trademark, trade dress or any other intellectual property right;

11. Arising out of false advertising, misrepresentation in advertising, antitrust, unfair competition, restraint of trade, unfair or deceptive business practices, including but not limited to, violations of any local, state or federal consumer protection laws;

12. Against **you** that are brought by or on behalf of any federal, state or local government agency or professional or trade licensing organizations; however, this exclusion shall not apply where the **claim** is alleging a **wrongful act** in **your** rendering **professional services** to such entity or for a **disciplinary proceeding**;

13. Arising out of liability **you** assume under any contract or agreement; however, this exclusion does not apply to liability **you** would have in the absence of such contract or agreement;

14. Against **you** that are brought by or on behalf of:

    a)  Any business entity that is owned, managed or operated, directly or indirectly, in whole or in part, by **you**;

    b)  Any parent company, subsidiary, successor or assignee of **yours**, or anyone affiliated with **you** or such business entity through common majority ownership or control; or

    c)  Any independent contractor supplying material or services to **you**;

15. Arising out of disputes involving:

    a)  **Your** fees or charges, including over-charges, or cost over-runs;

    b)  Collecting **your** fees from third parties;

    c)  The return of fees or other compensation paid to **you**; or

    d)  **Your** cost of correcting or re-performing or completing any **professional services**;

16. Arising out of **your** advising, requiring, obtaining or failing to advise, require or obtain any bond, suretyship or other form of insurance;

17. Arising out of or resulting, directly or indirectly, from any actual or alleged commingling, misappropriation or improper use of funds or monies; or

18. Arising out of a **claim** by any **insured** under this **policy** against any other insured under this **policy**.

F.  EXTENDED REPORTING PERIOD

1.  **You** will be entitled to an automatic **extended reporting period** for no additional premium. This extension is applicable to any **claim** made against **you** during the **policy period** and reported to **us** in writing, during the sixty (60) days immediately following the **policy termination date**.

2.  **We** will provide an optional **extended reporting period** as described below:

a) If this **policy** is canceled, terminated or nonrenewed, **you** shall have the right, upon payment of an additional premium, to an extension of the reporting period for any **claim** against **you** first made and reported after the date upon which the **policy period** ends, but only with respect to **wrongful acts** committed prior to the end of the **policy period** and otherwise covered by this **policy**. Such period shall be referred to as the optional **extended reporting period.**

   1) The available optional **extended reporting periods** and additional premium are determined in accordance with the rules, rates and rating plans **we** then have in effect in **your** state.

   2) **You** must request the optional **extended reporting period** in writing and must pay **us** the additional premium within 30 days following the date of such cancellation, termination or nonrenewal. If **we** do not receive **your** request and premium payment within 30 days following the date of such cancellation, termination or nonrenewal, **your** right to purchase the optional **extended reporting period** shall cease.

   3) If **we** cancel for non-payment of premium, **you** may purchase the optional **extended reporting period** only after any earned premium due **us** is paid within 10 days after the date of cancellation or **policy** expiration, whichever comes first.

b) All premiums paid for an optional **extended reporting period** shall be deemed fully earned as of the first day of the optional **extended reporting period**. The optional **extended reporting period** may not be canceled.

c) The optional **extended reporting period** shall not increase any limits of liability stated in Item **3.** of the Declarations page. For the purpose of **policy** limits, the reporting periods are part of, not in addition to, the **policy period.**

## G. DUTIES IN THE EVENT OF CLAIM(S) OR POTENTIAL CLAIM(S)

1. If **you** receive a **claim, you** and any other involved **insured(s)** must see to it that **we** receive written notice of the **claim**, with full details including the date received, as soon as practicable, but in no event later than 90 days after such **claim** is first made.

2. **You** and any other involved **insured** must:

   a) Immediately send **us** copies of any demands, notices, summonses or legal papers received in connection with the **claim;**

   b) Authorize **us** to obtain records and other information;

   c) Cooperate with **us** in the investigation, defense or settlement of the **claim;** and

   d) Assist **us**, upon our request, in the enforcement of any right against any person or entity which may be liable to **you** because of damages to which this insurance may apply.

3. No **insured** will, except at that **insured's** own cost, voluntarily make a payment, assume any obligation, agree to a settlement or incur any expense related to a **claim** without **our** consent.

4. If, during the policy period, **you** become aware of a **wrongful act** or any facts or other circumstance that occurred on or after the retroactive date but prior to the end of the **policy period** which may reasonably be expected to subsequently give rise to a claim against **you, you** must give **us** written notice as soon as practicable, but in any event not later than the end of the **policy period** or any **extended reporting period,** if applicable. To the extent possible notice should include:

   a) Where the **wrongful act** took place and any facts or circumstance concerning the wrongful act; and

   b) The names and addresses of any persons and entities involved.

5. Any **claim** arising out of the **wrongful act,** facts or circumstance which is subsequently made against **you** shall be deemed to have been first made at the time **we** received such written notice from **you,** if **we** receive proper notice of the **potential claim** according to paragraph **4.** above.

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

## H. CONDITIONS

### 1. CANCELLATION AND NON RENEWAL

   a) **We** may not cancel this **policy** except for failure to pay premium when due, in which case **we** will give 10 days written notice to the **named insured** before such cancellation is effective.

b) The **named insured** may cancel this **policy** for itself and all other **insureds** by written notice to **us** stating when thereafter the cancellation shall be effective. If this policy is cancelled, earned premium shall be computed in accordance with the customary short rate proportion of the premium.

c) **We** are not required to renew this **policy**. However, written notice of **our** intent to nonrenew this **policy** shall be sent to the **named insured** at least 60 days prior to expiration of the **policy period**.

2. **REPRESENTATIONS AND APPLICATION**

By accepting this **policy you** agree that:

a) The statements in the Declarations are accurate and complete;

b) Those statements are based on representations **you** made in **your** application for this insurance **policy;**

c) The representations made in **your** application are the basis of this **policy** and are to be considered as incorporated into and constituting a part of this **policy;**

d) Those representations are material to the acceptance of the risk **we** assumed under this **policy;**

e) **We** have issued this **policy** in reliance upon the truth, accuracy and completeness of such representations;

f) The application shall be interpreted as a separate application for coverage by each **insured**. No statement in the application, fact pertaining to or knowledge possessed by any **insured** shall be imputed to any other **insured** for the purpose of determining if coverage is available; and

g) Statements in the application, facts pertaining to or knowledge possessed by the individual signing the application shall be imputed to the **named insured.**

3. **LEGAL ACTION AGAINST US**

No person or entity has a right under this **policy:**

a) To join **us** as a party or otherwise bring **us** into a suit asking for **damages** from an **insured;** or

b) To sue **us** on this **policy** unless all of its terms have been fully complied with.

A person or entity may sue **us** to recover on an agreed settlement or on a final judgment against an **insured;** but **we** will not be liable for **damages** that are not payable under the terms of this **policy** or that are in excess of the applicable limit of liability. An agreed settlement means a settlement and release of liability signed by **us**, the **insured** and the claimant or the claimant's legal representative.

4. **CHANGE IN OWNERSHIP, CONTROL OR EXPOSURE**

a) If during the **policy period:**

1) Another person or entity or group of persons or entities acquires more than 50 percent of the assets of the **named insured;** or

2) Another person or entity, or group of persons or entities, acquires an amount of the outstanding securities representing more than 50 percent of the voting power for the election of the **named insured's** directors or trustees; or

3) The **named insured** consolidates with or merges with another entity,

**you** shall notify **us** of the change described in 1., 2., or 3. above, herein referred to as a **transaction,** as soon as practicable, but not later than 30 days after the effective date of the **transaction** and provide such additional information as **we** require.

b) If a **transaction** occurs, coverage under this **policy** shall continue until termination of the **policy period,** but only with respect to **claims** and **potential claims** made for **wrongful acts** which took place prior to the **transaction.**

c) If **you** fail to provide notice as described in 4.a. above, coverage provided to **you** under this **policy** shall terminate as of the date of the **transaction.**

d) The entire premium for this **policy** shall be deemed fully earned upon the occurrence of a **transaction.**

e) In the event of a **transaction**, the **named insured** will have the right, upon payment of an additional 75 percent of the premium, to an extension of coverage under the **policy** for **claim(s)** first made and reported during the 12 months after the **transaction,** but only with respect to any **wrongful act**

occurring prior to the **transaction** and otherwise covered by this **policy**. This 12-month period shall be referred to as the run-off period.

    1) "The premium" means the premium in effect immediately prior to the **transaction**.

    2) The rights contained in paragraph 4. shall terminate unless written notice of the election and the additional premium due are received by **us** within 60 days of the **transaction**.

  f) In the event of a **transaction**, the **named insured** has the right to purchase the run-off period, but has no right to purchase the optional **extended reporting period** described in **SECTION F.** of the **policy**.

  g) The additional premium for the run-off period shall be fully earned at the inception of the run-off period. The run-off period is not cancellable.

  h) The limit of liability for the run-off period is part of and not in addition to the limit of liability shown in Item **3.** of the Declarations page.

**5. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If **you** have rights to recover all or part of any payment **we** have made under this **policy**, these rights are transferred to **us**. **You** must do nothing after a **loss** to impair our rights to seek or obtain recovery from others. At **our** request, **you** will sue those responsible or transfer those rights to **us** and help us enforce them. In the event of any payment under this **policy**, we shall be subrogated to the extent of such payment to all of **your** rights of recovery. **You** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without **our** express written consent.

**6. ASSIGNMENT**

No change in, modification of or assignment of interest in this **policy** shall be effective except when made by a written endorsement to the **policy**.

**7. SOLE AGENT FOR THE INSURED**

By accepting this **policy**, **you** agree that only the **named insured** is authorized to act on behalf of all **insureds** with respect to the following: consenting to settlement or releasing rights under this **policy**, payment for premiums and deductibles, receiving return premiums, giving or receiving notice of cancellation or nonrenewal, requesting any optional **extended reporting period** or run-off period and agreeing to any changes in this insurance **policy**. Each **insured** agrees that the **named insured** shall act on its or their behalf with respect to such matters.

**8. COVERAGE TERRITORY AND VALUATION**

  a) This **policy** applies to a **wrongful act** committed anywhere in the world, provided that the **claim** is made and suit is brought against the **insured** within the United States, its territories or possessions or Canada.

  b) All premiums, limits, deductibles, **loss** and other amounts are expressed and payable in the currency of the United States of America. If a judgment is rendered, a settlement is denominated or another element of **loss** under this **policy** is stated in a currency other than the United States of America dollars, payment under this **policy** shall be made in United States of America dollar equivalent determined by the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of **loss** is due, respectively.

**9. OTHER INSURANCE**

  a) If other valid and collectible insurance is available to **you** for **loss** covered under this **policy**, the insurance provided by this **policy** shall be excess over such other insurance, regardless of whether or not such insurance is primary, contributory, excess, contingent or otherwise.

  b) When this insurance is excess **we** have no duty to defend **you** against any **claim** if any other insurer has a duty to defend **you** against the **claim**. If no other insurer defends **we** will undertake to do so but **we** will be entitled to **your** rights against those other insurers.

  c) When this insurance is excess over other insurance **we** will pay only our share of the amount of **loss**, if any, that exceeds the sum of:

    1) The total amount that all such other insurance would pay for the **loss** in the absence of this insurance;

**2)**  The total of all deductibles, self-insurance and retentions under all that other insurance.

We will share the remaining **loss**, if any, with any other insurance that is not described in this provision and was not bought specifically to apply in excess of the limit of liability shown in the Declarations page of this **policy**.

**d) Method of Sharing**

If all the other insurance permits contribution by equal shares, **we** will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of liability or none of the **loss** remains, whichever comes first.

If any other insurance does not permit contribution by equal shares, **we** will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of liability to the total applicable limits of liability of all insurers.

## 10. TWO OR MORE POLICIES, COVERAGE PARTS, OR ENDORSEMENTS ISSUED BY US

It is **our** stated intention that this **policy** and any other **policy**, coverage part or endorsement issued by **us**, or by another member of the **company**, shall not provide duplication or overlap of coverage for the same **claim**. If this **policy** and any other **policy** issued by **us**, or by another member of the **company**, to **you**, apply to the same **claim** then, **Condition 9. Other Insurance** notwithstanding:

**a)**  **We** shall not be liable under this **policy** for a greater proportion of the **loss** than the applicable limit of liability of this **policy** bears to the sum of the total limits of liability of all such policies; and

**b)**  The maximum amount payable under all such policies combined shall not exceed the highest applicable limit of liability under any one **policy**.

## 11. ALLOCATION

If **you** incur both **loss** covered by this **policy** and **loss** not covered by this **policy** on account of any **claim** because such **claim** includes both covered and non-covered matters, coverage with respect to such **claim** shall apply as follows:

**a)**  100 percent of **defense expenses** on account of the **claim** will be considered covered **loss**; and

**b)**  **We** shall fairly allocate all remaining **loss** that you incurred on account of such **claim** between covered **loss** and non-covered **loss**.

## 12. SEPARATION OF INSUREDS

Except with respect to the limits of liability, deductible and any rights or obligations assigned to the first **named insured**, this insurance applies:

**a)**  As if each **insured** were the only **insured**; and

**b)**  Separately to each **insured** against whom a **claim** is made.

## 13. CONFORMANCE TO STATUTE

The terms of this **policy** which are in conflict with the statutes of the state in which this **policy** is issued are amended to conform to those statutes.

## 14. SECTION TITLES

The titling of sections and paragraphs within this **policy** is for convenience only and shall not be interpreted as a term or condition of this **policy**.

## 15. BANKRUPTCY

**You** or **your** estate's bankruptcy or insolvency does not relieve **us** of **our** obligations under this **policy**.

## 16. LIBERALIZATION

If **we** adopt any revisions to the terms and conditions of this **policy** form to provide more coverage without an additional premium charge during the **policy** term, the broadened coverage will immediately apply. However, the broadened terms and conditions will not apply to any **claims** that were first made against **you** prior to the effective date of the revision.

# PROPERTY MANAGEMENT ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Named Insured:  BORGER MANAGEMENT INC
Policy Number:  LHR A111273 01

Issued by The Hanover Insurance Company.

This endorsement, Effective 12:01 A.M.  09/20/2014  modifies the following:

**A.   SECTION A – COVERAGE – WHAT THIS POLICY INSURES**, Paragraph **3.** is replaced by the following:

    **3.**  Personal Injury Coverage

       **We** will pay on **your** behalf those sums which **you** become legally obligated to pay as **damages** and **claim expenses** because of any **claim** made against **you** and reported to **us** in writing during the **policy period**, or any **extended reporting period**, if applicable, that arise from **your professional services** and are for:

       **a.**  **Your** defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress or other tort related to disparagement or harm to the reputation or character of any person or entity;

       **b.**  **Your** invasion or interference with the right to privacy or publicity, including but not limited false light, public disclosure of private facts, intrusion, and invasion; or

       **c.**  **Your** causing a third party to be subject to wrongful eviction, false arrest, detention, or imprisonment.

**B.**   The following is added to **SECTION E – EXCLUSIONS – WHAT THIS POLICY DOES NOT INSURE**:

This **policy** does not apply to **claim(s)**:

Based upon, arising out of, or in any way relating to, directly or indirectly:

    **a)**  Any promoting of, syndication of, offering or selling of any interest in any limited partnership;

    **b)**  Any services as a property developer, builder, construction manager, loss control inspector, risk manager, safety inspector, insurance agent, insurance broker, mortgage banker, mortgage broker, escrow agent, real estate appraiser, title abstractor, and/or title agent;

    **c)**  Any formation, growth, presence, release, dispersal, containment, removal, testing, for or detection or monitoring of, or failure to detect or monitor or warn about any molds, fungi, spores, or other similar growth or organic matter, including but not limited to Aspergillus, Pencillium or any strain or type of Stachybotrys, or toxic black molds;

**C.   SECTION E – EXCLUSIONS**, Paragraphs **6.** and **16.** are replaced by the following:

    **6.**  For any **bodily injury** or **property damage**; however, this exclusion shall not apply to any **claim** arising out of a **wrongful act** committed by an **insured** in the rendering of **professional services** as specified in Item **6.** of the Declarations;

   **16.**  Any failure to effect or maintain, in the whole or part, any policy of insurance or reinsurance, any bond, or any decision or advise regarding the type or amount of insurance, reinsurance, or bond to purchase or perils to cover.

     This exclusion shall not apply in the event the **insured** uses and consults with a properly licensed insurance agent for the insurance needs on all properties the **insured** is responsible for procuring and maintaining insurance. It is further understood that this **policy** shall not apply to the intentional failure to effect or renew any insurance.

All other terms and conditions remain unchanged.

**910-0079 01 12**                                                                                                           **Page 1 of 1**

# DISTRICT OF COLUMBIA MISCELLANEOUS PROFESSIONAL LIABILITY AMENDATORY ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Issued by The Hanover Insurance Company.

This endorsement modifies the following:

**SECTION H – CONDITIONS, Paragraph 1. Cancellation and Non Renewal** is amended to add the following:

d) Notices of cancellation or nonrenewal shall be sent by first class mail to the last address known to **us** with a statement of the specific reasons for cancellation or nonrenewal. At least 5 days before sending notice to the **named insured, we** will notify the agent or broker, if any, who wrote the **policy**. Proof of mailing will be sufficient proof of notice.

All other terms and conditions remain unchanged.



### NOTICE TO POLICYHOLDERS:
### MISCELLANEOUS PROFESSIONAL LIABILITY INSURANCE

### INFORMATION REGARDING EXTENDED
### REPORTING PERIOD ENDORSEMENT
### ("ERP COVERAGE")

The enclosed policy provides coverage for claims reported during the policy period. Subject to the policy's terms and conditions, you may purchase an Extended Reporting Period Endorsement, also known as "ERP coverage", that will extend the time for reporting claims arising out of professional services rendered while the policy was still in effect, although the policy may have been cancelled, nonrenewed, or terminated.  Please refer to Section F. of your policy for the terms and conditions for eligibility, purchasing or obtaining an Extended Reporting Period endorsement. *There is a limited time for requesting such an endorsement.*

The premium charged for the endorsement is expressed as a percentage of your policy's annual premium.

| Length of "ERP Coverage" Offered | "ERP Coverage" Premium |
|---|---|
| 12 months | 100 % of expiring annual premium |
| 24 months | 150 % of expiring annual premium |
| 36 months | 200 % of expiring annual premium |

*Extended Reporting Period Endorsements may be subject to state regulatory requirements.*

Please contact your agent or customer service representative for pricing specific to your situation and location.

# FAIR HOUSING ACT COVERAGE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Named Insured:  BORGER MANAGEMENT INC

Policy Number:  LHR A111273 01

Issued by The Hanover Insurance Company.

This endorsement, Effective 12:01 A.M.  09/20/2014  modifies the following:

**A.** The following is added to **SECTION A – COVERAGE – WHAT THIS POLICY INSURES**:

**Fair Housing Act Coverage**

**We** will pay on **your** behalf **damages** and **claim expenses** because of any **claim** arising out of **your professionals services** and made against **you** for violations of the Fair Housing Act of 1968, 42 USCS § 3601, et seq. (as amended) ("Fair Housing Act") and reported to **us** in writing during the **policy period**, or any **extended reporting period**, if applicable.

**Our** aggregate Limit of Liability for **damages** and **claim expenses** for all Fair Housing Act violation **claims** covered under this endorsement is $250,000 which amount will be included within, and not in addition to, the aggregate Limit of Liability set forth in Item  **3. b.** of the Declarations.

**B.** The following is added to **SECTION E – EXCLUSIONS – WHAT THIS POLICY DOES NOT INSURE**:

This **policy** does not apply to **claim(s)**:

For any fines, penalties, sanctions or taxes;

All other terms and conditions remain unchanged.

# LIMITED CONSTRUCTION PROPERTY MANAGEMENT ENDORSEMENT

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Named Insured:  BORGER MANAGEMENT INC
Policy Number:  LHR A111273 01

Issued by The Hanover Insurance Company.

This endorsement, Effective 12:01 A.M.  09/20/2014  modifies the following:

A. **SECTION A – COVERAGE – WHAT THIS POLICY INSURES**, Paragraph 3. is replaced by the following:

   3. Personal Injury Coverage

      **We** will pay on **your** behalf those sums which **you** become legally obligated to pay as **damages** and **claim expenses** because of any **claim** made against **you** and reported to **us** in writing during the **policy period**, or any **extended reporting period**, if applicable, that arise from **your professional services** and are for:

      a. **Your** defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress or other tort related to disparagement or harm to the reputation or character of any person or entity;

      b. **Your** invasion or interference with the right to privacy or publicity, including but not limited false light, public disclosure of private facts, intrusion, and invasion; or

      c. **Your** causing a third party to be subject to wrongful eviction, false arrest, detention, or imprisonment.

B. The following is added to **SECTION D – DEFINTIONS**:

   **Construction manager** means an **insured** providing the following services in connection with construction, or reconstruction of real property:

      1. Management of construction or reconstruction;

      2. Management of construction or reconstruction plans;

      3. Development and management of construction, reconstruction contracts and subcontracts; or

      4. Development of loss control and risk management plans in connection with construction or reconstruction.

C. The following is added to **SECTION E – EXCLUSIONS – WHAT THIS POLICY DOES NOT INSURE**:

   This **policy** does not apply to **claim(s)**:

   Based upon, arising out of, or in any way relating to, directly or indirectly:

      a) Any promoting of, syndication of, offering or selling of any interest in any limited partnership;

      b) Any services as a property developer, builder, construction manager, loss control inspector, risk manager, safety inspector, insurance agent, insurance broker, mortgage banker, mortgage broker, escrow agent, real estate appraiser, title abstractor, and/or title agent;

      c) Any formation, growth, presence, release, dispersal, containment, removal, testing, for or detection or monitoring of, or failure to detect or monitor or warn about any molds, fungi, spores, or other similar growth or organic matter, including but not limited to Aspergillus, Pencillium or any strain or type of Stachybotrys, or toxic black molds;

      d) Any services as a **construction manager**; however, this exclusion shall not apply to any non-structural minor maintenance and renovations that do not require the stamp of an architect or engineer;

D. **SECTION E – EXCLUSIONS**, Paragraphs 6. and 16. are replaced by the following:

   6. For any **bodily injury** or **property damage**; however, this exclusion shall not apply to any **claim** arising or of a **wrongful act** committed by an **insured** in the rendering of **professional services** as specified in Item 6. of the Declarations;

   16. Any failure to effect or maintain, in the whole or part, any policy of insurance or reinsurance, any bond, or any decision or advise regarding the type or amount of insurance, reinsurance, or bond to purchase or perils to cover.

      This exclusion shall not apply in the event the **insured** uses and consults with a properly licensed insurance agent for the insurance needs on all properties the **insured** is responsible for procuring and

maintaining insurance. It is further understood that this **policy** shall not apply to the intentional failure to effect or renew any insurance.

All other terms and conditions remain unchanged.

# LIMITED DISCRIMINATION COVERAGE ENDORSEMENT
## – PROFESSIONAL SERVICES

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Named Insured:  BORGER MANAGEMENT INC
Policy Number:  LHR A111273 01

Issued by The Hanover Insurance Company.

This endorsement, effective 12:01 A.M.  09/20/2014  modifies the following:

SECTION E – EXCLUSION, Paragraph 9. is replaced by the following:

9.   Arising out of any **employment practices** liability or any discrimination on any basis, including, but not limited to:   race, creed, color, religion, ethnic background, national origin, age, handicap, disability, gender, sexual orientation or pregnancy;

However, **we** will pay on **your** behalf **damages** and **claim expenses** incurred in the responding to a **claim** made against **you** and reported to **us** in writing during the **policy period**, or **extended reporting period**, if applicable, that arise from **your professional services** and for discrimination by **you** because of race, creed, color, age, gender, sex, sexual preference or orientation, national origin, religion, disability, handicap, marital status, or any other class protected under federal, state, local, or other law.

Notwithstanding anything to the contrary in the **policy**, including any endorsements thereto:

**Our** aggregate Limit of Liability for **damages** and **claim expenses** arising out of all discrimination **claims** covered under this endorsement is $250,000 which amount will be included within, and not in addition to, the aggregate Limit of Liability set forth in **Item 3. b.** of the Declarations.

All other terms and conditions remain unchanged.

# LOCK BOX COVERAGE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Named Insured:  BORGER MANAGEMENT INC
Policy Number:  LHR A111273 01

Issued by The Hanover Insurance Company.

This endorsement, Effective 12:01 A.M.  09/20/2014  modifies the following:

**SECTION E – EXCLUSIONS**, Paragraph **6.**, is replaced by the following:

6.  Arising out of **bodily injury** or **property damage**; however, this exclusion does not apply to **claims** for damage to or destruction of tangible property arising from the distribution, maintenance, operation or use of a lock box at any property owned, occupied, leased, listed by or under the control of **named insured**.

Notwithstanding anything to the contrary in the **policy**, including any endorsements thereto:

**Our** aggregate Limit of Liability for **damages** and **claims expenses** arising out of all lockbox **claims** covered under this endorsement is $100,000 which amount will be included within, and not in addition to, the aggregate Limit of Liability set forth in **Item 3. b.** of the Declarations.

All other terms and conditions remain unchanged.

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

**In Witness Whereof,** this company has caused this policy to be signed by its President and Secretary and countersigned on the declarations page, where required, by a duly authorized agent of the company.

Frederick H. Eppinger
President

Charles Frederick Cronin
Secretary

**Richard W. Luchs**

| | |
|---|---|
| **From:** | Toler, Maryland J. <Maryland.Toler@willis.com> |
| **Sent:** | Thursday, June 25, 2015 5:00 PM |
| **To:** | Tom Borger |
| **Cc:** | Richard W. Luchs; Joe Borger; DeShong, Denise; Uphoff, Janet |
| **Subject:** | RE: Buckingham |
| **Attachments:** | 2014 09 PROF HANOVER POLICY.pdf; ATT00001.txt |

Mr. Luchs,

Per Mr. Tom Borger's email below, attached is a copy of the Hanover professional liability policy effective September 20, 2014 to September 20, 2015, Policy #LHR A 111273 01.

Many thanks,

Maryland Toler, Senior Vice President, Client Advocate, Willis Group
12505 Park Potomac Ave, Suite 300, Potomac, MD 20854
Direct: 301 692-3113. Fax: 301 897-8506. Cell: 301 452-4567
Maryland.Toler@Willis.com, www.willis.com



**THE WILLIS CAUSE**
- We thoroughly understand our clients' needs and their industries.
- We develop client solutions with the best markets, price and terms.
- We relentlessly deliver quality client service.
- We get claims paid quickly.
- ...WITH INTEGRITY

Click here for more information about The Willis Cause.

Please be aware that the undersigned is not providing legal advice with this communication.  You should consult with your legal counsel if you have legal questions about the matters discussed herein.

**From:** Tom Borger [mailto:Tborger@borgermanagement.com]
**Sent:** Thursday, June 25, 2015 4:56 PM
**To:** Toler, Maryland J.
**Cc:** Richard Luchs (rwl@gdllaw.com); Joe Borger
**Subject:** Buckingham

Maryland
Please send ASAP the Hanover Policy to Richard Luchs

G. Thomas Borger
Chairman
1111 14TH ST NW, Suite 200
Washington, DC 20005
O: 202-898-1880 F: 202-898-1549



Equal Housing Opportunity

This e-mail communication and any attachments may contain confidential and privileged information for the use of the intended recipient(s).  If you are not an intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, distribution or copying of it or its contents is prohibited.  If you have received this communication in error, please notify Borger Management, Inc. immediately by telephone at (202) 898-1880 and destroy all copies of this communication and any attachments.

It is the responsibility of the recipient to ensure that this message and any attachments are virus free and no responsibility is accepted by Borger Management, Inc. or its affiliates for any loss or damage arising in any way from its receipt or use.

EXHIBIT B

**MANAGEMENT AGREEMENT**

between

**THE OWNERSHIP ENTITIES INDENTIFIED ON THE MANAGEMENT FEE SUMMARY
ATTACHED AS SCHEDULE A**

**Owner**


and


**BORGER MANAGEMENT, INC.**
**Agent**

*[handwritten: major June 2005 (To be Agreed upon by App 1 2005.]*

**IN CONSIDERATION** of the covenants herein contained in this Management Agreement ("Agreement")the Ownership Entities identified on the Management Fee Summary attached as Schedule A **(hereinafter called "OWNER")**, and BORGER MANAGEMENT, INC. (hereinafter called "AGENT", agree as follows:

**[1]**   The OWNER hereby engages the AGENT as an independent contractor to exclusively manage the properties described on Schedule A attached hereto and incorporated herein for all purposes (hereinafter called the "Property") upon the terms and conditions hereinafter set forth, for a term of *one (__) year* months beginning on the ___ day of _____, 2005 and ending on the _____ day of _____ 2006 The foregoing term is expressly subject to the termination provisions contained in Article 8 below, including without limitation the right of either party at anytime to terminate this Agreement on not less than ninety (90) days written notice as provided in Article 8 below. Schedule A may be amended at any time during the continuance of this Agreement in the event that either party terminates this Agreement as to one or more of the Properties, but not all the Properties.

**[2]**   **MANAGEMENT RESPONSIBILITIES:**

AGENT agrees to perform the responsibilities of AGENT hereunder for each Property and OWNER hereby authorizes AGENT to exercise such powers with respect to each Property as are provided herein to the extent necessary or advisable in AGENT'S reasonable discretion for the performance of AGENT'S duties hereunder. OWNER gives the AGENT the authority and power to perform the duties and obligations required herein and to assume all reasonable expenses in connection therewith as set forth in this Agreement and the Operating Budget as herein defined. AGENT agrees that it shall have no right or authority, express or implied, to commit or otherwise obligate OWNER or to encumber any Property in any manner whatsoever except to the extent specifically provided herein.

[2.1]   AGENT accepts the management of each Property, to the extent, for the period, and upon the terms herein provided and agrees to (i) furnish the services of its organization for the proper and efficient management, operation and maintenance of each Property consistent with the standard for comparable buildings in the Washington, D.C. metropolitan area and (ii) to faithfully and diligently render in a professional manner the services on its part to be performed hereunder during the term hereof.

[2.2]   To render the reports specified in Article 3 to the following person at the address shown:

**Name**                          **Address**
*[handwritten: Gary Warren]*   *[handwritten: 1 832 Jefferson Place NW 4th St, DC 20036]*

and to remit each month the net proceeds (provided AGENT is not required to make any mortgage, escrow, or tax payment on the first day of the following month) to OWNER or such other parties as directed by OWNER. AGENT will remit the net proceeds or the balance thereof after making allowance for such payments to the following persons, in the percentages specified, and at the addresses shown:

**Name**                    *directly*                    **Address**
                      *as*              **Percentage**
                            *Owner*

In case the disbursements and charges shall be in excess of the receipts, the OWNER agrees to pay such excess promptly upon notice from AGENT, but nothing herein contained shall obligate the AGENT TO ADVANCE ITS OWN FUNDS ON BEHALF OF THE OWNER.

[2.3]   AGENT shall prepare and submit to OWNER a proposed Operating Budget for the operation, repair, improvement and maintenance of each Property for each calendar year (January 1 – December 31). A draft of the budget shall be submitted to OWNER by November 1st of each year. The final proposed budget shall be delivered to OWNER no later than December 1st of each calendar year with the exception of the first calendar year. With respect to  calendar year 2006, AGENT shall prepare and submit to OWNER a proposed Operating Budget (as described above) on or before thirty (30) days from the date OWNER executes this Agreement.

OWNER will consider the proposed budget and then will consult with AGENT prior to the commencement of the forthcoming calendar year in order to agree on an "Approved Operating Budget". With the exception of the first calendar year, if approval for the final proposed Operating Budget has not been received by AGENT or denied by OWNER by the beginning of the calendar year, such budget shall be deemed to be the Approved Operating Budget. AGENT agrees to use diligence and to employ all reasonable efforts to ensure that the actual costs of maintaining, repairing and operating each Property shall not exceed the Approved Operating Budget pertaining thereto, either in total or by account category. During each calendar year, AGENT shall inform OWNER not less than monthly of increases in costs and expenses that were not foreseen during the applicable budget preparation period.

AGENT shall secure OWNER'S prior written approval for unbudgeted expenditures greater than $2,000.00. However, in cases of emergency AGENT may make expenditures for repairs which exceed the budgetary limits without prior written approval if it is necessary to prevent damage or injury to persons or property.

[2.4]   AGENT shall cause each Property to be operated, maintained and repaired in accordance with all applicable codes, statutes and ordinances, except as directed by OWNER, and in a condition at all times reasonably acceptable to OWNER including without limitation, cleaning, painting, decorating, plumbing, carpentry, grounds care and such other maintenance and repair work as may be necessary, subject to the limitations contained herein and any others which may be imposed by OWNER. All such work shall be done in a good and workmanlike manner. All capital expenditures must be approved in writing by OWNER. AGENT shall (i) give special attention to preventive maintenance, (ii) receive and investigate all repair and service requests by OWNER, take such action thereon as may be appropriate (subject to the terms of this Agreement), supervise all services in response to such requests and keep records of the same, and (iii) arrange for water, electricity, gas, sewage and trash disposal, vermin extermination and other necessary utilities and services.

[2.5]   AGENT shall supervise the existing service contracts for each Property and if necessary, shall enter into purchase orders or contracts as may be required for routine, day-to-day supplies or services in the orderly management of each Property as provided in the Approved Operating Budget for such Property. AGENT shall not enter into (i) any such contract outside of an approved budget.

[2.6]   AGENT shall consider and attend to the complaints of tenants; establish and maintain good tenant relations; and communicate to the tenants all rules relating to the respective Property as they may be established by OWNER or AGENT from time to time. AGENT shall monitor the operation of all tenants to ensure their compliance with such rules and the terms and provisions of their respective leases.

[2.7]   AGENT shall use its best efforts to diligently collect rents and/or assessments and other items due or to become due and all other fees or charges which may become due at any time from any tenant or from others for services provided in connection with or for the use of the Property and to collect and identify any income due OWNER from miscellaneous services provided to tenants or the public including, without limitation parking income, all revenues from work orders, construction charges, supervisory or approval charges, license fees, tenant storage, and coin operated machines of all types (vending machines, pay telephone, etc.), and give receipts therefor, to charge for reimbursement of operating costs, real estate taxes and tenant improvements. AGENT shall deposit all rents and other funds collected from the operation of each Property, including any and all advance rents, in a bank approved by OWNER in a special account or accounts (the "Operating Account") for each Property in the name of OWNER. Out of the Operating Account, AGENT shall pay the operating expenses of the applicable Property and any other payments relative to such Property as required by the terms of this Agreement. OWNER may direct AGENT from time to time to change a depository bank or the depository arrangement.

[2.8]   AGENT shall perform and comply with all of the obligations, terms and conditions to be performed by or complied with by the OWNER under the leases with tenants of the Property. AGENT shall administer the apportionment and collection of the operating expenses and real estate taxes for each Property which are to be reimbursed by tenants in accordance with the terms of that tenant's lease and AGENT shall reconcile the tenants' payments with the actual operating expenses and real estate taxes for such Property.

[2.9]   AGENT shall institute and prosecute actions, with such counsel approved by OWNER, to oust tenants and to recover possession of the property to sue for and recover rent; and, when expedient, to settle, compromise, and release such action or suits, or reinstate such tenancies; provided OWNER has approved such actions as provided below.   AGENT may not, without the prior approval of OWNER, terminate any lease, lock out a tenant, institute suit for rent or for use and occupancy, or initiate proceedings for recovery of possession. In connection with any collection efforts only legal counsel or collection firms designated by OWNER shall be retained.

[3]   **FINANCIAL REPORTS:**

[3.1]   AGENT, in the conduct of its responsibilities to OWNER, shall maintain adequate and separate complete books, records and accounts for each Property in a manner satisfactory to OWNER. Such records, books and accounts shall be kept separate from the records and accounts of AGENT.

> (a)   AGENT shall furnish reports of all transactions occurring from the first day of the monthly accounting period to the last day of the monthly accounting period. For this purpose, these reports are to be delivered to OWNER no later than the 10th day of the following calendar month after the end of the accounting period and shall include an income and expense statement. The reports shall be in the form attached hereto as Schedule B.

> (b)   In addition, AGENT, upon OWNER'S written request from time to time, shall prepare such reports as OWNER may require or desire; provided, however, that if such reports impose additional extraordinary cost or effort on AGENT, then AGENT shall be entitled to reimbursement of its additional costs for preparation of such reports upon terms and conditions first approved by OWNER in writing.

> (c)   AGENT shall not be responsible for the preparation of any form, reports, income or other tax returns required to be filed or prepared on behalf of OWNER in connection with the Property by any local, state, federal or other governmental authority, except the annual income-expense report required by the tax assessor's office and such forms or reports as are necessary for the performance of AGENT'S duties as set forth in Article 2 above.

**[4]   DISBURSEMENTS:**

[4.1]   The AGENT agrees to manage each Property in a prudent and economical manner and to distribute all rents and other income received by AGENT from the operation of each Property in accordance with Section 4.3 below. If at any time there shall be insufficient funds from a Property to make payments of all the obligations to be paid in connection with such Property, and at all other times when it shall be reasonable or prudent, AGENT shall make disbursements in accordance with the following schedule of priorities:

[4.1a]   The AGENT shall pay from rents and other incomes (and reserves where appropriate) all real estate taxes, municipal liens and other similar assessments in respect of such Property and all indebtedness secured by deeds of trusts or mortgages against such Property in accordance with the provisions thereof.

[4.1b]   The AGENT shall then pay out of the remaining rent and other income (and reserves where appropriate) all costs and expenses for the operation and management of such Property as provided herein, including, but not limited to utilities, repairs and maintenance, supplies, redecoration services, advertising, AGENT'S compensation, and other general and administrative operating expenses, and when payable, insurance.

[4.1c]   After disbursements provided in subsections 4.1 (a) and (b) above, the AGENT shall retain sums sufficient to establish reserves as provided in the Approved Operating Budget for the following purposes:

(1)     Insurance premiums when due,

(2)     Real estate taxes and other assessments when due,

(3)     Replacements, maintenance and improvement of such Property.

[4.1d]   All amounts retained by the AGENT as reserves under subsection 4.1(c), above shall, to the extent reasonably practical, be deposited in an interest-bearing account or accounts or in certificates of deposit, in the name of the OWNER, with the interest thereon accruing to the benefit of the OWNER.

[4.1e]   The balance of any rents and other income received by the AGENT from the operation of such Property after payment or provision for payment of all other disbursements shall be made to the OWNER in monthly or such other installments and in such manner as the OWNER may direct.

[4.2]    All payments to be made by the AGENT hereunder shall be made from such rents and other income generated by such Property (and reserves retained therefrom) or such other funds as may be provided by the OWNER. If rents, reserves and other income generated by such Property and in the possession of the AGENT at any time shall be insufficient to make the disbursements required above, the AGENT shall not be obligated to make any advance to or for the account of the OWNER or to pay any sum, except out of the funds held or provided aforesaid.

[4.3]    AGENT shall pay from the Operating Account all expenses properly incurred by AGENT pursuant to this Agreement and set forth in the Approved Operating Budget, including, without limitation, the following expenses:

(a)     Cost to correct any violation of federal, state and municipal laws, ordinances, regulations and orders relative to the leasing, use, operation, repair and maintenance of such Property, or relative to the rules, regulations or orders of the local Board of Fire Underwriters or other similar body, if any, provided such cost is not caused by AGENT'S gross negligence or willful misconduct.

(b)     Actual and reasonable cost of making all repairs, replacements, additions, decorations and alterations properly incurred by AGENT pursuant to this Agreement, provided such cost is not the result of AGENT'S gross negligence or willful misconduct.

(c)     Cost incurred by AGENT in connection with all service agreements properly entered into pursuant to this Agreement.

(d)     Cost of collection of delinquent rentals collected through a collection agency, subject to Section 2.9.

(e)     Legal fees of attorneys provided such attorneys and fees have been approved of (or designated as provided in Section 2.9) by OWNER in advance.

(f)     Cost of capital expenditures made pursuant to the Approved Operating Budget.

(g)    Cost of printed checks for each bank account required by OWNER and cost of printed forms and supplies required for use at the Property.

(h)    Cost of OWNER-approved advertising and promotional material.

(i)    All compensation payable to AGENT pursuant to this Agreement.

(j)    Utility costs and insurance costs (except premiums for insurance AGENT is obligated to maintain hereunder).

[4.4]    The following expenses or costs incurred by or on behalf of AGENT in connection with the management of the Property shall be at the sole cost and expense of AGENT and shall not be reimbursed by OWNER:

(a)    Cost of gross salary and wages, payroll taxes, insurance, workmen's compensation, and other benefits of AGENT'S office personnel and other overhead of AGENT.

(b)    General accounting and reporting services within the reasonable scope of the AGENT'S responsibility to OWNER, such as the production of each of the financial reports required to be produced by AGENT hereunder.

(c)    Cost of forms, papers, ledgers, and other supplies and equipment used in the AGENT'S office at any location off the Property.

(d)    Cost of off-site electronic data processing equipment, or any pro rata charge thereon, or costs of any repairs, improvements, enhancements or modifications thereto.

(e)    Cost of electronic data processing, or any pro rata charge thereof, for data processing provided by computer service companies.

(f)    Cost attributable to losses arising from the gross negligence or fraud or willful misconduct on the part of AGENT, its employees, agents or representatives.

(g)    Cost of comprehensive crime insurance or fidelity bond or other insurance purchased by AGENT for its own account.

## [5]    THE OWNER FURTHER AGREES:

[5.1]    Except for AGENT'S and its directors', officers', employees', agents', or servants' gross negligence, willful misconduct or fraud, OWNER will indemnify, defend and hold AGENT, its directors, officers, agents, servants and employees harmless from and against any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, to which AGENT may become liable or subject by reason of or arising out of the performance or nonperformance of AGENT'S duties and activities within the scope of this Agreement or arising from any action or activity on, or the condition of, a Property. To the extent of any such claims which are covered under OWNER'S insurance policy or policies with respect to a Property, OWNER releases AGENT, its

partners, directors, officers, agents, servants and employees from all such claims, irrespective of the cause thereof, except that AGENT shall be required to pay any deductible that is applicable in connection with such claim.

[5.2] AGENT shall indemnify, defend and hold OWNER harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorney's fees and court costs (except to the extent covered by insurance carried by OWNER, except that AGENT shall be required to pay any deductible up to $10,000 that is applicable in connection with such claim), sustained or incurred by or asserted against OWNER by reason of or arising out of AGENT'S gross negligence or willful misconduct.

## [6]   THE OWNER AGREES TO PAY THE AGENT EACH MONTH:

[6.1] FOR MANAGEMENT: A monthly management fee in the amount of Ten Thousand ($10,000.00) ("Management Fee") during the period this Agreement remains in full force and effect. If at anytime, this Agreement terminates as to one or more Properties, but not all (e.g., a sale of a Property), then the foregoing Management Fee shall be adjusted by deleting the proportionate amount of the Fee allocated for such Property; the amount of the Fee allocated to each Property is set forth on Exhibit A.

[6.2] CONSTRUCTION MANAGEMENT: In the event AGENT supervises the construction of capital improvements to a Property, AGENT shall be paid a separate fee to be determined by OWNER and AGENT as is comparable to fees charged for similar work in the Washington, D.C. metropolitan area.

## [7]   IT IS MUTUALLY AGREED THAT:

[7.1] The OWNER expressly withholds from the AGENT any power or authority to make any structural changes in any building or make any other major alteration or additions in or to any such building or equipment therein, or to incur any expenses chargeable to the OWNER other than expenses set forth in the Approved Operating Budget and this Agreement without the prior direction of the following person:

**Name**                    **Address**

except in the sole, but reasonable opinion of the AGENT, for such emergency repairs as may be required because of danger to life or property or which are immediately necessary for the preservation and safety of the Property or the safety of the tenants and occupants thereof or are required to avoid the suspension of any necessary service to the Property.

[7.2] The AGENT does not assume and is given no responsibility for compliance of any building on the Property or any equipment therein with the requirements of any statute, ordinance, law or regulation of any governmental body or any public authority or official thereof having jurisdiction, except to notify the OWNER promptly or forward to the OWNER promptly any complaints, warnings notices, or summonses

received by it relating to such matters. The OWNER represents that to the its actual knowledge the Property and such equipment comply with all such requirements and authorizes the AGENT to disclose the ownership of the property to any such officials and agrees to indemnify and hold harmless the AGENT, its representatives, servants, and employees, of and from all loss, cost, expense, and liability whatsoever which may be imposed on AGENT by reason of any present or future violation or alleged violation of such laws, ordinances, statutes, or regulations, except for any future willful acts or omissions caused by the acts or omissions of AGENT and its directors, officers, employees or agents.

[7.3]   In the event it is alleged or charged that any building on the property or any equipment therein or any act or failure to act by the OWNER with respect to the property or the sale, rental, or other disposition thereof fails to comply with, or is in violation of, any of the requirements of any constitutional provision, statute, ordinance, law or regulation of any governmental body or any other or ruling of any public authority or official thereof having or claiming to have jurisdiction thereof, and the AGENT, in its sole and absolute discretion, considers that the action or position of the OWNER, or registered managing agent with respect thereto, may result in damage or liability to the AGENT, the AGENT shall have the right to cancel this Agreement at any time by written notice to the OWNER of its election to do so. Such cancellation shall not release the indemnities of the OWNER set forth in Sections 5.1 and 7.2 above and shall not terminate any liability or obligation of the OWNER to the AGENT for any payment, reimbursement, or other sum of money due and payable to the AGENT hereunder prior to the date of such termination.

[7.4]   HAZARDOUS WASTES - AGENT shall have no obligation to investigate or determine whether wastes, regulated substances, or other materials that may pose a potential hazard to human health or the environment (hereinafter "Hazardous Wastes") are present or were ever present on the Property, except for causing tenants of the Property to comply with the provisions of their respective leases. AGENT, its servants, consultants, agents, officers, directors, and employees shall be indemnified and held harmless from and against all liability, claims, damages, losses and expenses, direct and indirect (including but not limited to reasonable attorneys and expert fees, court and arbitration costs) arising out of or resulting from the presence or former presence of Hazardous Wastes on the Property, except to the extent the presence of such Hazardous Wastes was caused by the willful acts or omissions of AGENT, its servants, consultants, agents, officers, directors or employees. For the purpose of this section, the term 'Hazardous Wastes" shall be constructed in its very broadest sense and includes, but it not limited to, any chemical or other substance now or in the future subject to any federal, state, or local environmental, health, or safety statute or regulation, including the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).

7.5   AGENT shall provide an insurance certificate naming OWNER in the form attached hereto as mutually agreed by the parties. Upon mutual agreement of the parties, such form shall be attached hereto as Schedule C and incorporated herein for all purposes. AGENT will keep such insurance in effect during the term of this Agreement.

7.6     AGENT shall require that all subcontractors brought onto each Property have insurance coverage, at the subcontractor's expense, in the following minimum amounts:

  (a)    Workmen's Compensation - statutory amount;

  (b)    Employer's Liability - $100,000 minimum;

  (c)    Broad Form Commercial General Liability (naming OWNER and AGENT as additional insureds) - $1,000,000 per occurrence Combined Single Limit; $2,000,000 aggregate (i.e., such insurance shall be broad form and shall include contractual liability, personal injury protection and completed operations coverage);

  (d)    Auto Liability (if deemed appropriate by AGENT) - $1,000,000 minimum;

  (e)    Property Insurance coverage for tools and equipment brought onto and/or used on each Property by the subcontractor - an amount equal to the replacement costs of all such tools and equipment; and

  (f)    Contractor's risk insurance for construction or renovation work to the extent not included in broad form commercial general liability.

AGENT must obtain the OWNER'S prior permission to waive any of the above requirements. AGENT shall obtain and keep on file a Certificate of Insurance which shows that the subcontractor is so insured.

7.7     Should any claim, demand, suit or any other legal proceedings be made or instituted by any person against OWNER, which arise out of any of the matters relating to this Agreement or out of any matters relating to AGENT'S other obligations to OWNER or to third parties, AGENT shall give OWNER, upon OWNER'S request, all pertinent information and reasonable information in the defense or other disposition thereof. AGENT shall notify OWNER within a reasonable period of time given the circumstances of any fire, material accident or other casualty, condemnation proceedings, rezoning or other governmental order, lawsuit or threat thereof involving each Property; and violations relative to the leasing, use, repair and maintenance of each Property under governmental laws, rules, regulations, ordinances, or like provisions. AGENT will not bear responsibility for noncompliance unless such noncompliance is due to the willful act or gross negligence of AGENT or its directors, officers, employees, agents or servants, and AGENT shall be entitled to receive from OWNER reasonable fees and the expenses incurred by off-site staff in connection with any such cooperation or incurred in assisting OWNER following the expiration or termination of this Agreement.

7.8     OWNER reserves the right for OWNER'S employees, and others appointed by OWNER, to conduct examinations, during regular business hours and following reasonable written notice to AGENT, of the books and records maintained for OWNER by AGENT no matter where the books and records are located. OWNER also reserves the right to perform any and all additional audit tests relating to AGENT'S activities either at a particular Property or at any office of the AGENT during regular business hours and

following reasonable written notice to AGENT; provided such audit tests are related to those activities performed by AGENT for OWNER.

7.9   AGENT shall, upon OWNER'S written request from time to time, submit copies of any lease, contract, bill, license, agreement or any other document relating to a particular Property or to this Agreement to the OWNER when requested.

**[8]   CANCELLATION**

Notwithstanding anything in Article 1 above to the contrary, this Agreement may be terminated, upon the occurrence of any of the following circumstances:

[8.1]   This Agreement may be cancelled upon ninety (90) days prior written notice by either the AGENT or the OWNER.

[8.2]   In addition, this Agreement may be cancelled upon five (5) days written notice to the other party if a petition in bankruptcy is filed by either OWNER or AGENT, or if either shall make an assignment for the benefit of creditors or take advantage of any insolvency act, OWNER or AGENT, following the effective date of this Agreement, may terminate this Agreement.

[8.3]   OWNER may further terminate this Agreement immediately upon notice to AGENT in the event of any misappropriation of Property funds, willful misconduct, criminal misconduct, gross negligence or fraud by AGENT, its employees, agents or contractors.

[8.4]   Upon cancellation of this Agreement, AGENT shall promptly (but in no event later than thirty (30) days after cancellation) (i) surrender and deliver to OWNER the respective Property; (ii) deliver to OWNER all materials, equipment, tools, supplies, keys, original records, contracts, leases, subleases or occupancy agreements, receipts for deposits, unpaid bills and documents relating to each Property, and such other accounts, papers, books and records pertaining to this Agreement as OWNER shall request; (iii) assign such existing contracts relating to the operation and maintenance of each Property as OWNER shall require, if assignable, provided that OWNER shall agree to assume all liability thereunder accruing after such assignment; (iv) deliver to OWNER an inventory of all furniture, fixtures, equipment, machinery, vehicles, supplies and other fixed assets on each Property as of the date of termination, including the condition and quantity of each of the same; (v) furnish all such information and take all such action as OWNER shall reasonably require in order to effectuate an orderly and systematic ending of AGENT'S duties and activities hereunder; (vi) a final accounting, reflecting the balance of income and expenses and assets and liabilities of the Property as of the date of termination to be delivered within thirty (30) days after such termination; and (vii) any balance or monies of OWNER or tenant security deposits, or both, held by AGENT with respect to each Property to be delivered immediately upon such termination. Upon such termination OWNER will assume responsibility for payment of all approved or authorized unpaid bills. To the extent not theretofore paid to AGENT, OWNER shall pay AGENT for any sums of money due under this Agreement for services or actions properly taken prior to termination, notwithstanding any termination of this Agreement. All provisions of

this Agreement that require the OWNER to have insured or to defend, reimburse, or indemnify the AGENT (including, but not limited to, Section 5.1) shall survive any termination and, if AGENT is or becomes involved in any proceeding or litigation by reason of having been the OWNER'S agent, such provisions shall apply as if this Agreement were still in effect.

[8.5]   Upon the effective date of termination of this Agreement for any reason, the authority created hereby shall immediately cease and AGENT shall have no further right to act as agent for OWNER, or otherwise perform or be paid for any management services except as may be expressly provided herein.

[8.6]   The termination of this Agreement under the provisions of this Article 8 shall not affect the rights of either party with respect to any damages it has suffered as a result of any breach of this Agreement, nor shall it affect the rights or obligations of either party with respect to liability or claims accrued, or arising out of events occurring prior to the date of termination, all of which shall survive such termination.

[9]   **SALE OF PREMISES:**

In the event of the sale of the Property, this Agreement may be cancelled upon thirty (30) days written notice to the AGENT. If OWNER executes a listing agreement with a broker (other than AGENT) for sale of the Property, AGENT shall cooperate with such broker to the end that the respective activities of AGENT and broker may be carried on without friction and without interference with tenants and occupants. AGENT will permit the broker to exhibit the Property. Nothing herein contained shall preclude AGENT from being either a cooperating or listing broker in connection with the sale, subject to OWNER'S approval.

[10]   **TRANSFER OF MANAGEMENT:**

Upon termination, the AGENT shall cooperate with the OWNER in the transfer of management responsibilities to the OWNER or OWNER'S designee.

[11]   **RESPONSIBILITIES OF OWNER:**

Everything done by the AGENT within the terms and scope of authority provided in this Agreement shall be as agent of the OWNER, and all obligations or reasonable expenses so incurred shall be for the account, on behalf of, and at the expense of the OWNER, except for those expenses expressly provided for herein to be borne and paid for by the AGENT.

[12]   **AGREEMENT NOT AN INTEREST IN PROPERTY; NO JOINT VENTURE:**

This Agreement shall not be deemed at any time to be a lease or an interest or a lien of any nature against the Property. This Agreement shall not create any partnership, joint venture, agency or employment agreement or other similar arrangement between AGENT and OWNER. AGENT shall be deemed and shall perform all services as provided herein as an independent contractor. No term or provision of this Agreement is intended to, or shall, be for the benefit of any person, firm or corporation not a party hereto and no such other person, firm, corporation or entity shall have any right or cause of action hereunder.

**[13]    LIMITATION OF LIABILITY:**

If AGENT is awarded a money judgment against OWNER, then recourse for satisfaction of such judgment shall be limited to execution against OWNER'S estate and interest in the applicable Property and no other asset of the OWNER, any partner, director, officer, agent, servant, employee, trustee, representative or affiliate shall be available to satisfy such judgment nor shall any partner, director, officer, agent, servant, employee, trustee, representative or affiliate have any personal liability for the obligations and liabilities of OWNER under this Agreement. Notwithstanding anything to the contrary contained in this Article 13, the foregoing limitation on AGENT'S source of recovery will not apply in those instances where proceeds of insurance are available to satisfy the judgment.

Each Owner is only responsible for those obligations and responsibilities of Owner under this Agreement related to or connected with such Owner's respective Property and shall have no liability or responsibility related to or connected with any other Property.

In addition, neither party shall be liable to the other for, and each party waives any and all rights to claims against the other party, any special, indirect, incidental, punitive, consequential, speculative or exemplary damages in connection with this Agreement, including, but not limited to, lost revenue or profits, even if a party has knowledge of the possibility of such damages.

**[14]    NOTICE:**

All notices, demands, consents and reports provided for in this Agreement shall be in writing and shall be given to the OWNER or AGENT at the address set forth below or at such other address as they individually may specify in writing:

OWNER:          c/o The Jenco Group
                1832 Jefferson Place, N.W.
                Washington, D.C.  20036
                Attn:  Mr. Marvin R. Jawer

AGENT:          Borger Management, Inc.
                1111 14th Street, N.W., Suite 200
                Washington, D.C. 20005
                Attn: *Joseph F. Borger*

With a copy to:     _____
                    _____
                    _____
                    Attn:_____

Such notice or other communication may be mailed by United States registered or certified mail, return receipt requested, postage prepaid and may be deposited in a United States Post Office or a depository for the receipt of mail maintained by the United States Post Office. Such notices, demands, consents and reports may also be delivered by hand or by overnight courier service. For purpose of this Agreement, notices will be deemed to have

been given upon (i) delivery (or attempted delivery if delivery is refused in person), (ii) one (1) business day after having been deposited for overnight delivery with any reputable overnight courier service or the earlier of actual delivery (or attempted delivery if delivery is refused), or (iii) three (3) business days after being deposited in any post office or mail depository maintained by the United States Postal Service.

**[15] MISCELLANEOUS:**

[15.1]   Assignment:  AGENT shall not be entitled to assign any rights or benefits hereunder or delegate or subcontract any obligations or liabilities hereunder, unless expressly provided under the terms of this Agreement. Any purported assignment, subcontract nor delegation by AGENT in violation of the foregoing, shall be void at the option of OWNER.  Subject to the provisions of this subparagraph, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

[15.2]   Governing Law:  This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

[15.3]   Severability:   If any term or provision of this Agreement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining terms and provisions of this Agreement shall not be affected thereby, and in lieu of each such illegal, invalid or unenforceable term or provision there shall be added automatically to this Agreement a legal, valid and enforceable term or provision as similar as possible to the term or provision declared illegal, invalid and unenforceable.

[15.4]   Entire Agreement; Modifications:  This document represents the entire agreement between the parties with respect to the subject matter hereof, and to the extent inconsistent therewith, supersedes all other prior agreements, representations and covenants, oral or written. All modifications to this Agreement must be in writing and signed by OWNER and AGENT.

[15.5]   Counterparts:  This Agreement may be executed in two or more counterparts, each of which is an original, but all of which together shall constitute one and the same instrument. The individuals signing this Agreement represent and warrant that they are authorized to bind and do so bind the party on behalf of which they are executing this Agreement.

[15.6]   Compliance with Laws:  During the term of this Agreement, and any renewal thereof, each party will use its best effort to comply with all local, State, and Federal laws and regulations applicable to its business and the performance of its obligations under this Agreement.

[15.7]   Attorneys' Fees:  In the event of any action or proceeding brought by any party against another party under this Agreement, the prevailing party shall be entitled to recover its costs and attorneys' fees, if any, in such amount as the court may judge reasonable.

[15.8]   Force Majeure:  Either party's delay in, or failure of, performance under this Agreement is excused where such delay or failure is caused by an act of God, fire or other catastrophe, electrical, computer, or mechanical failure, work stoppage, or acts of government or agencies thereof outside such party's reasonable control.

[15.9]   <u>Third Parties:</u> The provisions of this Agreement and the rights and obligations created hereunder are intended for the sole benefit of OWNER and AGENT, and do not create any right, claim or benefit on the part of any person not a party to this Agreement.

[15.10]  <u>Authority to Execute:</u> Each person executing this Agreement on behalf of another person or organization represents and warrants to each member of all other parties that he or she is fully authorized to execute and deliver this Agreement on behalf of such person or organization. Each member of each party represents and warrants to all members of all other parties that no consent of any other person not a party to this Agreement is necessary in order for this Agreement to be fully and completely binding upon each member of the parties hereto.


[SIGNATURES APPEAR ON THE NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have affixed or caused to be affixed their respective signatures this ___M A___ day of _____, 2005.

WITNESSES:                              OWNER:

                                        **2050 Wilson Blvd., LLC**

_____                 By: _____
                                            Marvin R. Jawer, Manager

                                        **2050 Wilson Boulevard LLC II**

_____                 By: _____
                                            Marvin R. Jawer, Managing Member

                                        **BJ Associates LLC**

_____                 By: _____
                                            Marvin R. Jawer, Manager

                                        **Buckingham Jenco Limited Partnership**

_____                 By: _____
                                            Marvin R. Jawer, general partner

                                        **Blue Horseshoe LLC**
                                        By: Blue Horseshoe Manager, Inc.,
                                            Its Managing Member

_____                     By: _____
                                                Marvin R. Jawer, President

                                        **ABC Fourteenth Street Associates L.P.**

_____                 By: _____
                                            Marvin R. Jawer, general partner

                                        **Madigan Associates L.P.**

_____                 By: _____
                                            Marvin R. Jawer, general partner

                                        Date: _____

**AGENT:**
**BORGER MANAGEMENT, INC.**

*Barbara Duarte*

By: *[signature]*

Date: *2/17/05*

H:\Users\RLevin\Jower\Borger Management Agreement\Master Commercial Management Agreementgyfb 2-7-05.doc

## SCHEDULE A
## LIST OF PROPERTIES, RESPECTIVE OWNERSHIP ENTITIES, AND ADDRESSES AND AMOUNT OF THE ANNUAL FEE ATTRIBUTABLE TO EACH PROPERTY

| Project | Ownership Entity | FED ID # | Property Address | Proposed Fee |
|---|---|---|---|---|
| 2050 Wilson Blvd. | 2050 Wilson Blvd., LLC | 52-2093214 | 2050 Wilson Blvd & 2055 15th St., North, Arlington, VA | $7,000 |
| Court House Metro | 2050 Wilson Boulevard LLC II | 54-2046670 | 2121 15th St., North, Arlington, VA | 23,000 |
| Simmonds Properties | BJ Associates LLC | 27-0036262 | 2042-44 Clarendon Blvd., Arlington, VA | 4,000 |
| | | | 2041-45th St., North, Arlington, VA (MCM Building) | |
| | | | 2045-16th St., North, Arlington, VA (Commonwealth Bldg) | |
| Buckingham Shopping Center | Buckingham Jenco Limited Partnership | 52-1619444 | 235-49, 250-252, 300, 301-319 N Glebe Rd & 4235-41 Pershing Dr., Arlington VA | |
| | | | 313 North Glebe Road, Arlington, VA (2nd Floor) | 33,000 |
| | | | 700 North Glebe Road, Arlington, VA | |
| 13th & U Metro Project | Blue Horseshoe LLC | 52-2242080 | 1250 U St., NW, Washington, DC | 23,000 |
| Lincoln Center (13th & U) | ABC Fourteenth Street Associates L. P. | 52-1765307 | 1300-24 U St., NW, Washington, DC | 13,000 |
| 14th & U | Madigan Associates L. P. | 52-1765910 | 1934-44 14th St. & 1408-1418 U St., NW, Washington, DC | 12,000 |
| TOTAL | | | | $120,000 |

104,000

**SCHEDULE B**
**FORM OF REPORTS**

# REPORTS

Income & Expense Statement (Monthly & Cumulative-Including budget comparison)-Cash Basis
Cash Receipts
Cash Disbursements
Cash Summary
Delinquency Report
Rent Roll
Expiration Report
Annual Budget
Annual CAM & R/E Tax Reconciliations

**SCHEDULE C**
**INSURANCE CERTIFICATE**

# EXHIBIT C

**From:** Marvin Jawer [mailto:mjawer@jjencogroup.com]
**Sent:** Tuesday, June 09, 2015 2:21 PM
**To:** Carrie Palmer
**Cc:** Jennifer Dickey
**Subject:** RE: Wire Distribution

Yes, It can and should be code as either 'Marvin Distribution' or 'Owner Distribution' Which every you prefer.

Thanks to you both

Sent from my iPhone

---- On Tue, 09 Jun 2015 11:19:18 -0700 **Carrie Palmer<carrie@jjencogroup.com>** wrote ----

Jennifer,

Correct, it will be code as Owner Distribution.

Thanks

---- On Tue, 09 Jun 2015 11:18:04 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

Carrie,

Just to confirm, you want me to wire the funds from the Buckingham Jenco LP operating or reserve account, at Eagle Bank, and this should be coded as an owner distribution?

Thanks,

**Jennifer Dickey**

4

Controller

O: 202-898-2930  F: 202-898-1549

jdickey@borgermanagement.com



**From:** Carrie Palmer [mailto:carrie@jjencogroup.com]
**Sent:** Tuesday, June 09, 2015 2:13 PM
**To:** Jennifer Dickey
**Cc:** Marvin Jawer
**Subject:** RE: Wire Distribution

It will be code as 'Marvin Expenses' and I'm sure you get the wire instructions.

Kindly email me with the confirmation copy once processed now.

Thanks
Carrie

---- On Tue, 09 Jun 2015 11:11:40 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

We can send a wire from Eagle Bank with no problem.

Just let me know how you want me to code the wire on our GL after it's been processed.

Thanks,

**Jennifer Dickey**

Controller

O: 202-898-2930  F: 202-898-1549

jdickey@borgermanagement.com



**From:** Carrie Palmer [mailto:carrie@jjencogroup.com]
**Sent:** Tuesday, June 09, 2015 2:07 PM
**To:** Jennifer Dickey
**Cc:** Marvin Jawer
**Subject:** RE: Wire Distribution

Jennifer,

Yes, Let me know if you have the access to send the wire transfer out from Eagle Bank or which of them do you have access and would be easy for you to send the wire transfer out from.

Attached is also the wire instructions.

---- On Tue, 09 Jun 2015 11:03:05 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

For Buckingham it would be very easy to do online with Eagle Bank, but since we do not have online access to SunTrust, doing one for Wilson Boulevard would be a great deal more complicated.

Thanks,

**Jennifer Dickey**

Controller

O: 202-898-2930  F: 202-898-1549

jdickey@borgermanagement.com



**From:** Marvin Jawer [mailto:mjawer@jjencogroup.com]
**Sent:** Tuesday, June 09, 2015 2:00 PM
**To:** Jennifer Dickey

6

**Cc:** carrie@jjencogroup.com; carrie@dlpbooks.com
**Subject:** Wire Distribution

Hi Jennifer,

I will like to know if a wire transfer can still be sent out today for $200,000 international for a payoff.

Carrie, I will need you to follow up with Jennifer for me and send them the wire instructions you have on file we talked about this Morning.

Thanks

Marvin

Sent from my iPhone

7

EXHIBIT D

 **EAGLEBANK**

# Completed Wire Details

## Debit Information

| | |
|---|---|
| Wire type: | USD international wire |
| Account: | OP Buck - *0769 |
| Security code: | |
| Effective date: | 06/09/2015 |
| Amount: | $200,000.00 |
| Currency: | USD |
| Entered by: | JDICKEY |
| Entry date/time: | 06/09/2015 02:40:56 PM (ET) |
| Transmitted by: | JDICKEY |
| Transmit date/time: | 06/9/2015 02:40 PM (ET) |
| Status: | CONFIRMED |
| Confirmation number: | 2115564557 |
| Reference number: | 20150609L1LFBM0C000154 |

## Recipient Information

| | |
|---|---|
| Bank ID type: | SWIFT |
| Bank ID: | BKCHMOMXXXX |
| Recipient account: | 218810122978 |
| Bank name: | BANK OF CHINA, MACAU BRANCH |
| Bank address 1: | MACAU |
| Bank address 2: | |
| Bank address 3: | |
| Recipient name: | Zob International Limited |
| Recipient address 1: | 206 shaoshan nan lu |
| Recipient address 2: | Changsha Hunan China |
| Recipient address 3: | |
| Additional information for recipient: | |

## First Intermediary Information

| | |
|---|---|
| Bank ID type: | |
| Bank ID: | |
| Intermediary account: | |
| Bank name: | |
| Bank address 1: | |
| Bank address 2: | |
| Bank address 3: | |

## Second Intermediary Information

| | |
|---|---|
| Bank ID type: | |
| Bank ID: | |
| Intermediary account: | |
| Bank name: | |

Bank address 1:
Bank address 2:
Bank address 3:

## Wire Initiator Information

| | |
|---|---|
| Wire initiator name: | Marvin Jawer-Buckingham Jenco LP |
| Wire initiator address 1: | C/O Borger Management Inc |
| Wire initiator address 2: | 1111 14th St NW, Suite 200 |
| Wire initiator address 3: | Washington, DC 20005 |

## Approval History Information

Approval status: 1 of 1 received

| Action | User ID | Date | Time |
|---|---|---|---|
| Enter Request | JDICKEY | 06/09/2015 | 02:40:56 PM (ET) |
| Approve Request | JDICKEY | 06/09/2015 | 02:40:56 PM (ET) |

# EXHIBIT E

*Exhibit C*

**Claudia Good**

| | |
|---|---|
| **From:** | Marvin Jawer <mjawer@jjencogroup.com> |
| **Sent:** | Monday, June 15, 2015 4:54 PM |
| **To:** | Carrie Palmer |
| **Cc:** | Jennifer Dickey |
| **Subject:** | Re: RE: Re: RE: Wire Distribution |

Are you still in the office?

*Email Contact #2 6/9/15*

---- On Mon, 15 Jun 2015 12:43:52 -0700 **carrie@jjencogroup.com** wrote ----

Jennifer, Yes and thanks, let me know if an exception can be made.

Thanks

---- On Mon, 15 Jun 2015 12:42:56 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

This is the only account that I can wire from for you guys. I'm not sure what else to do. Let me go talk to Claudia and see what she says.

Thanks,

**Jennifer Dickey**

Controller

O: 202-898-2930  F: 202-898-1549

jdickey@borgermanagement.com



**From:** Carrie Palmer [mailto:carrie@jjencogroup.com]
**Sent:** Monday, June 15, 2015 3:40 PM
**To:** Jennifer Dickey
**Cc:** Marvin Jawer
**Subject:** RE: Re: RE: Wire Distribution

1

Jennifer,

We are not in town now as we requested a new ID already, The old one expired, Is there anyway we could get these done or can it be done from any of our Bank Account?

Thanks

----On Mon, 15 Jun 2015 12:28:54 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

Hey Carrie,


I know this is a pain, but because of the large amount of the wire, and the fact that I did a similarly large international wire last week, the bank is asking for a copy of photo ID to complete the wire.


Since I'm not a signer on the account, but you are ☺ ....Can you send me a copy of your driver's license so we can get this wire completed?




Thanks,

**Jennifer Dickey**

Controller

O: 202-898-2930  F: 202-898-1549

jdickey@borgermanagement.com





**From:** Carrie Palmer [mailto:carrie@jjencogroup.com]
**Sent:** Monday, June 15, 2015 3:20 PM
**To:** Marvin Jawer
**Cc:** Jennifer Dickey
**Subject:** Re: Re: RE: Wire Distribution

2

Jennifer,
Are you back from Lunch and be able to complete the wire now.

Thanks
Carrie

---- On Mon, 15 Jun 2015 10:47:18 -0700 **Marvin Jawer <mjawer@jjencogroup.com>** wrote ----

Jennifer,


Enjoy your meal, Will be waiting for the confirmation copy once done.



Thanks

Marvin


---- On Mon, 15 Jun 2015 10:45:01 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

I stepped out of the office for lunch but will complete the wire as soon as I return.

Jennifer Dickey, Controller ~mobile~
Borger Management Inc
202-898-2930

On Jun 15, 2015 1:41 PM, Carrie Palmer <carrie@jjencogroup.com> wrote:

Jennifer,
Sorry for the late reply, I was busy in a meeting, Attached is the wire instructions needed. Please do send email for the confirmation copy once done.

Do confirm the receipt of this email for the wire instructions needed received.

Marvin, I will let you know also once done.

Thanks
Carrie


---- On Mon, 15 Jun 2015 10:29:07 -0700 **Marvin Jawer <mjawer@jjencogroup.com>** wrote ----

Yes, As it was sent Last-week but its going to Philippines, Its for $410,000 and I will have Carrie send you the wire instructions and Have the confirmation copy send once done.

3

Thanks

Marvin


Sent from my iPhone


---- On Mon, 15 Jun 2015 10:00:09 -0700 **Jennifer Dickey<JDickey@borgermanagement.com>** wrote ----

Yes, I can process it through Eagle in the same way as I did last week. Just let me know how much, and to who.



Thanks,

**Jennifer Dickey**

Controller

O: 202-898-2930  F: 202-898-1549

jdickey@borgermanagement.com




**From:** Marvin Jawer [mailto:mjawer@jjencogroup.com]
**Sent:** Monday, June 15, 2015 12:56 PM
**To:** Jennifer Dickey
**Cc:** carrie
**Subject:** Wire Distribution


Hi Jennifer,

Are you in the office today? I will like to know if a wire transfer can still be sent out today international.


Thanks

Marvin

Sent from my iPhone

EXHIBIT F

Richard W. Luchs

| | |
|---|---|
| From: | Tom Borger <Tborger@borgermanagement.com> |
| Sent: | Thursday, July 02, 2015 8:53 AM |
| To: | Richard W. Luchs |
| Cc: | Joe Borger; Arianna Royster; Claudia Good |
| Subject: | FW: Borger Management |



G. Thomas Borger
Chairman
1111 14TH ST NW, Suite 200
Washington, DC 20005
O: 202-898-1880 F: 202-898-1549
tborger@borgermanagement.com



**From:** DeShong, Denise [mailto:Denise.DeShong@willis.com]
**Sent:** Thursday, July 02, 2015 8:50 AM
**To:** Tom Borger
**Cc:** Toler, Maryland J.; Anjou, Kanita; Smits, Kelly
**Subject:** FW: Borger Management

Tom,

Please see the response from Hanover's coverage council Mike Weber.  We will continue to press Hanover and the other carriers for a timely decision on coverage.

I hope you have a good 4th and will be in contact with you next week.

Best Regards
Denise

---

Denise DeShong, AIC    Risk Consultant    Willis Risk Control and Claim Advocacy Practice
Willis Group,    225 Schilling Circle Suite 150    Hunt Valley MD 21030
Direct: 410-584-7513, Fax 410-527-7274, Cell 443-722-9326 denise.deshong@willis.com , www.willis.com

Follow us on social media – and the WillisWire blog

1

**From:** Michael Weber [mailto:MWeber@leoweber.com]
**Sent:** Wednesday, July 01, 2015 5:17 PM
**To:** DeShong, Denise
**Cc:** CHAPLICK, ALLISON L; Anjou, Kanita; Toler, Maryland J.; Uphoff, Janet
**Subject:** Re: Borger Management

Denise-

Thank you for your email and voice mail message. I am out of the office, but wanted to get back to you today.

Hanover will not stand in the way of Tom Borger looking to mitigate his exposure by reimbursing Buckingham Jenco for their alleged loss. Mr Borger's decision to do so is his decision and will not impact our analysis of coverage. At the same time, Hanover cannot at this time, provide Mr. Borger with the assurance he is looking for that Hanover will afford coverage under its policy. Hanover's investigation remains ongoing.

Please let us know the status of the insured's claims against the other carriers we discussed during our call. Please be assured of our continued cooperation throughout the pendency of this matter. Hanover continues to reserve all rights and defenses available to it under its policy, by contract, statute in law or otherwise.

You are welcome to call Allison or me if you want to discuss further.

Thank you,
Michael Weber

*Michael J. Weber*
**Licensed and Offices in Illinois and Michigan**
www.leoweber.com
LEO & WEBER, P.C.
1 N. LaSalle St., Suite 3600
Chicago, IL 60602
(312) 857-0910

Michigan Address:
LEO & WEBER, P.C.
PO Box 87
Harbert, MI 49115

Please forgive and forget any typos! Sent from my iPhone 6.

LEO & WEBER, P.C., EMAIL CONFIDENTIALITY NOTICE: This transmission may be subject to the attorney/client privilege and/or work product doctrine, or be strictly confidential. If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this email. If you received this email in error, please reply to notify me (only) and delete this message. Thank you.

On Jul 1, 2015, at 10:03 AM, DeShong, Denise <Denise.DeShong@willis.com> wrote:

Allison and Michael,

·I have spoken to Tom Borger this morning and he is agreeable to waiting for your coverage decision until next week.   He does feel that he is entirely responsible for replacing the funds as his employee did not follow procedures.   He wants to do this by Monday of next week which is before you can provide your decision.   He would like something from you indicating he will not prejudice the policy by making a voluntary payment of this matter with Buckingham Jenco.   He understands your agreement to this does not guarantee you are going to reimburse him that money but is hopeful.   Please let me know when he can expect something from you.

We are trying to get something in writing from ACE and Hartford and I will keep you posted on my progress.

All the best

Denise

**Denise DeShong, AIC     Risk Consultant    Willis Risk Control and Claim Advocacy Practice**
Willis Group,    225 Schilling Circle Suite 150    Hunt Valley MD 21030
Direct: 410-584-7513, Fax 410-527-7274, Cell 443-722-9326 denise.deshong@willis.com , www.willis.com

Follow us on social media – and the WillisWire blog

-----Original Appointment-----
**From:** CHAPLICK, ALLISON L [mailto:ACHAPLICK@HANOVER.COM]
**Sent:** Tuesday, June 30, 2015 4:17 PM
**To:** Michael Weber; DeShong, Denise
**Cc:** Anjou, Kanita; Toler, Maryland J.
**Subject:** Borger Management
**When:** Tuesday, June 30, 2015 3:15 PM-3:45 PM (UTC-06:00) Central Time (US & Canada).
**Where:** 800-899-2113 (6303078)

This e-mail, including attachments, is intended for the exclusive use of the addressee and may contain proprietary, confidential or privileged information. If you are not the intended recipient, any dissemination, use, distribution or copying is strictly prohibited. If you have received this e-mail in error, please notify me via return e-mail and permanently delete the original and destroy all copies.

3

For information pertaining to Willis' email confidentiality and monitoring policy, usage restrictions, or for specific company registration and regulatory status information, please visit http://www.willis.com/email_trailer.aspx

We are now able to offer our clients an encrypted email capability for secure communication purposes. If you wish to take advantage of this service or learn more about it, please let me know or contact your Client Advocate for full details. ~W67897

---

4

EXHIBIT G

**LEWIS**
**BRISBOIS**
**BISGAARD**
**& SMITH LLP**
ATTORNEYS AT LAW

550 West Adams Street, Suite 300
Chicago, Illinois 60661
Telephone: 312.345.1718
Fax: 312.345.1778
www.lewisbrisbois.com

DARCY L. IBACH
DIRECT DIAL: 312.463.3339
DARCY.IBACH@LEWISBRISBOIS.COM

July 30, 2015

Via Certified Mail and Email
Borger Management, Inc.
c/o Joseph Borger
    Tom Borger
1111 14th St. NW #200
Washington, DC 20005

Re:    Claim No.      15-00571124
       Claimant:      Buckingham Jenco ("BJ")
       Insured:       Borger Management Inc, ("BMI")
       Policy:        Miscellaneous Professional Liability

Dear Mr. Borger:

    Please be advised that Lewis Brisbois Bisgaard & Smith has been retained by Hanover Insurance Company to review the Miscellaneous Professional Liability Policy issued to Borger Management for coverage for on the pre-suit claim brought by an "Owner", Buckingham Jenco Limited Partnership ("BJ"), against its Agent, Hanover's insured, Borger Management, Inc. ("BMI") under the parties' Management Agreement. Please be advised that for the reasons stated below, Hanover Insurance Company ("Hanover") must respectfully decline coverage for the claim.

    The facts reveal that BJ alleged that BMI's Controller engaged in gross negligent acts by transmitting $200,000 from BJ's bank account in response to a phony June 9, 2015 email directing that BMI pay an entity in China. In the claim letter, BJ asserts the "loss was caused by the gross negligence of BMI" as:

a. BMI and its employees, including Controller Jennifer Dickey, neglected to comply with certain internal procedures at BMI by authorizing a wire transfer without prior notification to Thomas Borger or Joseph Borger, Michael Borger, the CFO of BMI or any employee or representative of BJ.

b. BMI failed to obtain Joseph Borger's signature authorizing the wire transfer which occasioned the Loss.

ALBUQUERQUE • ATLANTA • BEAUMONT • BOSTON • CHARLESTON • CHICAGO • DALLAS • DENVER • FORT LAUDERDALE • HOUSTON • LA QUINTA
LAFAYETTE • LAS VEGAS • LOS ANGELES • MADISON COUNTY • NEW ORLEANS • NEW YORK • NEWARK • ORANGE COUNTY • PHILADELPHIA • PHOENIX
PORTLAND • PROVIDENCE • SACRAMENTO • SAN BERNARDINO • SAN DIEGO • SAN FRANCISCO • SEATTLE • TAMPA • TEMECULA • TUCSON • WICHITA

4818-0594-0262.1

July 30, 2015
Page 2

   c. BMI omitted to detect clear indicia of fraud of the bogus email address and appreciate that a request for a wire transfer to China was inherently suspect.

This letter demanded that BMI restore the $200,000 plus interest to BJ's account within 48 hours and a statement be provided that no other improper transfers were made from the BJ's two bank accounts.

On June 15, 2015, the Chief Financial Officer of the insured detailed the backdrop of the claim to the Senior Vice President of Willis Group noting that Ms. Dickey did not contact anyone at BMI or Jenco to verify and confirm the wire transfer of funds request before proceeding with the wire transfer. The end result was that Ms. Dickey wired the funds by both initiating and self-approving the wire transfer in the online banking system in violation of BMI's normal protocols which require that Ms. Dickey obtain additional approval on non-recurring payments.

To preserve client relations, the insured operating at its own peril, quickly reimbursed the $200,000 to BJ's account and has since terminated Ms. Dickey's employment for her failure to follow proper office procedure with regard to the handling of funds. Hanover was asked to consent to the coverage for the settlement of the claim, but it advised that "Hanover cannot at this time, provide Mr. Borger with the assurance he is looking for that Hanover will afford coverage under its policy. Hanover's investigation remains ongoing." Since this time, Hanover has requested and received additional information from the insured to complete its investigation and have considered the following issues: Whether based on the terms of the Management Agreement – Paragraph 13, Limitation of Liability if BMI had defenses to the claim. Since the parties contractually agreed that neither was liable to the other, it appears that the insured was not legally obligated to pay as damages the $200,000 to BJ because these parties contractually agreed that "neither party shall be liable to the other for, and each party waives any and all rights to claims against the other party...including but not limited to loss revenue...". Thus, instead of defending the claim based on the Limitation of Liability provision of the Management Agreement, the insured made a business decision that it would rather just pay the claim, presumably to preserve its good client relations.

(1) Whether the Miscellaneous Professional Liability Policy pursuant to its terms, conditions, Insuring Agreements and Exclusions provides coverage for this claim given that this claim "arises out of" the "improper use of funds".

A review of the pertinent management agreement and policy follows.

### I. MANAGEMENT AGREEMENT

[2]   **MANAGEMENT RESPONSIBILITIES**

[2.3] \*\*\*\* AGENT shall secure OWNER'S prior written approval for unbudgeted expenditures greater than $2,000.00. However, in cases of emergency AGENT may make expenditures for repairs which exceed the budgetary limits without prior written approval if it is necessary to prevent damage or injury to persons or property.

July 30, 2015
Page 3

[2.7] *** Out of the Operating Account AGENT shall pay the operating expenses of the applicable Property and any other payments relative to such Property as required by the terms of this Agreement. OWNER may direct AGENT from time to time to change a depository bank or the depository arrangement.

## [4]   DISBURSEMENTS:

[4.3]   AGENT shall pay from the Operating Account all expenses properly incurred by AGENT pursuant to this Agreement and set forth in the Approved Operating Budget, including, without limitation, the following expenses:

(a)   Cost to correct any violation of federal, state and municipal laws, ordinances, regulations and orders relative to the leasing, use, operation, repair and maintenance of such Property, or relative to the rules, regulations or orders of the local Board of Fire Underwriters or other similar body, if any, provided such cost is not caused by AGENTS gross negligence or willful misconduct.

(b)   Actual and reasonable cost of making all repairs, replacements, additions, decorations and alterations properly incurred by AGENT pursuant to this Agreement, provided such cost is not the result of AGENTS gross negligence or willful misconduct.

(c)   Cost incurred by AGENT in connection with all service agreements properly entered into pursuant to this Agreement.

(d)   Cost of collection of delinquent rentals collected through a collection agency, subject to Section 2.9.

(e)   Legal fees of attorneys provided such attorneys and fees have been approved of (or designated as provided in Section 2.9) by OWNER in advance.

(f)   Cost of capital expenditures made pursuant to the Approved Operating Budget.

## [5]   THE OWNER FURTHER AGREES:

[5.1]   Except for AGENTS and its directors', officers', employees', agents', or servants' gross negligence, willful misconduct or fraud, OWNER will indemnify, defend and hold AGENT, its directors, officers, agents, servants and employees harmless from and against any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, to which AGENT may become liable or subject by reason of or arising out of the performance or nonperformance of AGENT'S duties and activities within the scope of this Agreement or arising from any action or activity on, or the condition of, a Property. To the extent of any such claims which are covered under OWNER'S insurance policy or policies with respect to a Property, OWNER releases AGENT, its partners, directors, officers, agents, servants and employees from all such claims, irrespective of the cause

July 30, 2015
Page 4

thereof, except that AGENT shall be required to pay any deductible that is applicable in connection with such claim.

\* \* \*

**[7] IT IS MUTUALLY AGREED THAT:**

**[7.1]** The OWNER expressly withholds from the AGENT any power or authority to make any structural changes in any building or make any other major alteration or additions in or to any such building or equipment therein, or to incur any expenses chargeable to the OWNER other than expenses set forth in the Approved Operating Budget and

| Name | Address |
|------|---------|

except in the sole, but reasonable opinion of the AGENT, for such emergency repairs as may be required because of danger to life or property or which are immediately necessary for the preservation and safety of the Property or the safety of the tenants and occupants thereof or are required to avoid the suspension of any necessary service to the Property.

**[11] RESPONSIBILITIES OF OWNER:**

Everything done by the AGENT within the terms and scope of authority provided in this Agreement shall be as agent of the OWNER, and all obligations or reasonable expenses so incurred shall be for the account, on behalf of, and at the expense of the OWNER, except for those expenses expressly provided for herein to be borne and paid for by the AGENT.

**[13] LIMITATION OF LIABILITY:**

If AGENT is awarded a money judgment against OWNER, then recourse for satisfaction of such judgment shall be limited to execution against OWNER'S estate and interest in the applicable Property and no other asset of the OWNER, any partner, director, officer, agent, servant, employee, trustee, representative or affiliate shall be available to satisfy such judgment nor shall any partner, director, officer, agent, servant, employee, trustee, representative or affiliate have any personal liability for the obligations and liabilities of OWNER under this Agreement. Notwithstanding anything to the contrary contained in this Article 13, the foregoing limitation on AGENT'S source of recovery will not apply in those instances where proceeds of insurance are available to satisfy the judgment.

Each Owner is only responsible for those obligations and responsibilities of Owner under this Agreement related to or connected with such Owner's respective Property and shall have no liability or responsibility related to or connected with any other Property.

In addition, neither party shall be liable to the other for, and each party waives any and all rights to claims against the other party, any special, indirect, incidental,

4818-0594-0262.1

July 30, 2015
Page 5

punitive, consequential, speculative or exemplary damages in connection with this Agreement, including, but not limited to, lost revenue or profits, even if a party has knowledge of the possibility of such damages.

## II. THE HANOVER POLICY

The Hanover policy was issued to Borger Management Inc., under policy number LHR A111273 01 and provides $1M in liability limits per claim and in the aggregate subject to a $10,000 deductible for the policy period of 9/20/14-9/20/15. The professional services are for "property management". The insured reported the claim on June 19, 2015.

## A. COVERAGE — WHAT THIS POLICY INSURES
### 1. Professional Services Coverage

We will pay on **your** behalf those sums which **you** become legally obligated to pay as **damages** and **claim expenses** because of any **claim** made against **you** arising from a **wrongful act** in the rendering or failure to render **professional services** by **you**.

The following additional requirements and limitations shall apply to coverage provided under A.1 above and A.3. and A.4. below:

a.    The **wrongful act** must have first occurred on or after the applicable **retroactive date(s)**;

b.    **You** had no knowledge of facts which could have reasonably caused **you** to foresee a **claim**, or any knowledge of the **claim**, prior to the effective date of this **policy**; and,

c.    The **claim** must first be made and reported to **us** in writing during the **policy period** or any **extended reporting period**, if applicable, and must arise from any **wrongful act** to which this **policy** applies.

## B. DEFENSE AND SETTLEMENT (INCLUDED IN THE LIMIT OF LIABILITY)

We have the right to investigate and the exclusive right to defend any **claim** made under this **policy**, even if the allegations are groundless, false or fraudulent until there is a final adjudication against **you**. We are not obligated to defend any criminal investigation, criminal proceeding or prosecution against **you**. If a **claim** is not covered under this **policy**, we will have no duty to defend it.

                        ***

## D. DEFINITIONS

**Claim** means a written demand or **suit you** receive.

**Claim expenses** means all expenses we incur or authorize in writing for the investigation, adjustment, defense or appeal of a claim. These expenses include fees charged by a lawyer, mediator or arbitrator with our consent for which you are obligated. **Claim expenses** also mean:

1.  The premium on appeal, attachment or similar bond; and

2.  Up to $250 per day per insured for supplemental payment for reasonable expenses incurred for attendance at hearings, trials, or depositions at **our** request or with our consent by such **insured**. Such payment shall not exceed $5,000 in the aggregate for all **insureds** in each **claim**.

**Claim expenses** do not include salaries, wages, fees, overhead or benefit expenses associated with:

---

July 30, 2015
Page 6

    3. Any **insured** except as specified in subparagraph **2.** above; or

    4. **Our** employees.

**Damages** means monetary judgments, awards or settlements unless otherwise excluded. **Damages** includes (i) pre-judgment interest; and (ii) post judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of judgment within the applicable limit of liability.

**Damages** also means punitive or exemplary **damages** or the multiple portions thereof, if insurable under the applicable law of the jurisdiction most favorable to the insurability of such **damages** provided such jurisdiction is where:

    1. Those **damages** were awarded or imposed; or

    2. Any **wrongful act** occurred for which such **damages** were awarded or imposed;

    3. The **named insured** resides, is incorporated or has its principal place of business; or

    4. We are incorporated or have our principal place of business.

**Damages** do not include any costs or expenses in complying with any demand for or award of **equitable relief**, even if such compliance is compelled as a result of a judgment, award or settlement.
\*\*\*

**Professional Services** means those services described in Item 6 of the Declarations which **you** perform for others for a fee. [Item 6. Professional Services – property management].

**Wrongful act** and **wrongful acts** means any actual or alleged negligent act, error, omission or misstatement committed in **your professional services**.

**E. EXCLUSIONS - WHAT THIS POLICY DOES NOT INSURE**

This **policy** does not apply to **claim(s)**

**13.** Arising out of liability **you** assume under any contract or agreement; however, this exclusion does not apply to liability **you** would have in the absence of such contract or agreement;
    \*\*\*

**17.** Arising out of or resulting, directly or indirectly, from any actual or alleged commingling, misappropriation or improper use of funds or monies; or
\*\*\*

**G. DUTIES IN THE EVENT OF CLAIM(S) OR POTENTIAL CLAIM(S)**

**3.** No **insured** will, except at that **insured's** own cost, voluntarily make a payment, assume any obligation, agree to a settlement or incur any expense related to a **claim** without **our** consent.
    \*\*\*

**III. ANALYSIS**

The insured bears the burden of showing that the underlying claim comes within the policy's coverage. *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 969 (D.C. 1999). When such

July 30, 2015
Page 7

contracts are clear and unambiguous, they will be enforced by the courts as written, so long as they do not violate a statute or public policy. *Travelers Indem. Co. v. United Food & Comm. Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001).

The Management Agreement provides a defense to any liability of the insured/Agent to the Owner in Paragraph 13 – Limitation of Liability. In particular, the Management Agreement provides that "neither party shall be liable to the other for, and each party waives any and all rights to claims against the other party...." As such, the insured had a defense to the payment of the claim based on the limitation of liability provision in the Management Agreement.

Paragraph A of the insuring agreements of the Hanover Policy states that coverage is provided for sums that the insured is legally obligated to pay as damages because of any claim made against the Insured arising from a wrongful act in the rendering or failure to render professional services by you. The insured independently and voluntarily elected to pay the claim, despite the fact that there existed a defense to liability for the claim and knowledge that Hanover was still investigating: (1) the claim, (2) any defenses the insured had to the claim and (3) whether coverage was afforded for the claim. Because the insured paid the entirety of the claim without mustering any defense when a defense was available, the question becomes whether the insured was even legally obligated to pay the claim. Please note, that the terms of your policy provides that an insurer is legally obligated only to pay a claim that the insured was legally obligated to pay. Hanover therefore, reserves its rights to deny coverage that it is not legally obligated to pay indemnity based on the fact that the insured was not legally obligated to pay the damages it elected to pay.

In addition to the insured's election not to defend the claim on what appears to be a solid limitation of liability defense, Hanover owes no duty to pay reimbursement of the settlement based on Exclusion 17 of the policy. As the courts have acknowledged, exclusions "must be enforced even if the insured did not foresee how the exclusion operated,", otherwise courts will find themselves in the undesirable position of "rewrit[ing] insurance policies and reallocat[ing] assignment of risks between insurer and insured." *Capitol Speciality Ins. Corp. v. Sanford Wittels & Heisler, LLP*, 793 F. Supp. 2d 399, 409 (D.D.C. 2011).

Exclusion 17 provides the policy does not apply to claims "<u>arising out</u> of or resulting, directly or indirectly from any actual or alleged commingling, misappropriation <u>or improper use of funds or monies</u>". The operative clause is separated by the word or, and as such, this exclusion operates to preclude coverage for the improper transmittal of funds, as this is an "improper use of funds". The insured's procedures for the proper use of funds significantly departs from the acts committed by its former Comptroller employee when issuing the transfer of funds which are the subject of this claim. In particular, see the July 21, 2015 signed statements of Insured employees Marvin Perez and Adenike Famuyide at paragraphs e, f and g which detail the proper use of Owner funds as compared to the misuse of funds committed by the former Comptroller.

July 30, 2015
Page 8

It should be recognized that Exclusion 17 is broad in scope. The phrase 'arising out of' has been given broad meaning by the courts. See, *Burk & Reedy, LLP v. Am. Guar. & Liab. Ins. Co.*, 2015 U.S. Dist. LEXIS 35878 (D.D.C. Mar. 23, 2015). ("In light of the Court of Appeals' conclusion that "arising out of" is commonly understood to mean, "originating from, growing out of, flowing from, or the like," *Id.* at 688, the Court will not "seek out ambiguity" in the Policy "where none exists. . .") This broad reaching coupled with the phrase "improper use of funds" evidences that coverage is not afforded for the "replacement of funds" which the insured seeks.

An Illinois district court has held that a professional liability policy issued to an escrow agent did not afford coverage for claims alleging that the agent mishandled escrow funds by failing to disburse the funds to pay claimants' property taxes and insurance premiums or to return the funds to claimants. *Hawks v. Am. Escrow, LLC*, 2012 U.S. Dist. Lexis 43890 (N.D. Ill. Mar. 16, 2012). The court concluded that the allegations fell squarely within the policy's exclusion barring coverage for claims "alleging, based upon, arising out of, or attributable to the commingling or improper use of, or failure to properly segregate or safeguard funds."

In *Bethel v. Darwin Select Ins. Co.*, 735 F.3d 1035 (8th Cir. 2013), the Eighth Circuit, applying Minnesota law, considered the application of a customer funds exclusion in a professional liability policy. "Darwin argues that the entirety of UGT's complaint falls within the Customer Funds Exclusion because all of UGT's claims "arise out of," result from, or in some way involve the loss or improper use of customer funds." *Id.* at 1039. The court explained:

> The plain language of the exclusion makes clear that it applies regardless of whose conduct caused the loss or improper use of Customer funds. ... the Customer Funds Exclusion applies to any claim that arises out of any loss or improper use of client funds caused by anyone, be they a "guilty" insured, an "innocent" insured, or even a non-insured. It is irrelevant whether [the individual principals] participated in the wrongful conduct that triggered the Customer Funds Exclusion, so long as UGT's claims arose from some loss or misuse of customer funds.

*See also, Murray v. Greenwich Ins. Co.*, 533 F.2d 644 (8th Cir. (Minn.) 2008), wherein the court explained its declination of coverage based on the broad meaning given to the operative phrase 'arising out of' and the pertinent policy's "improper use of funds" exclusion :

> Each of the claims asserted within the underlying complaint, either directly or by incorporation, allege an injury originating from, or having its origin in, growing out of, or flowing from the failure to return the deposited funds. See *Associated Indep. Dealers, Inc.*, 229 N.W.2d at 518. "But for" the failure to refund those deposits as promised, there would have been no claims. In other words, had the funds not been mishandled the claims alleged in the complaint would not have arisen. Thus, each of the claims is causally connected to and arose out of the failure to return the entrusted deposits. Accordingly, we conclude the exclusion applies and Greenwich has no duty to defend.

July 30, 2015
Page 9

Likewise, but for the misuse of funds by the Comptroller, there would be no claim herein. As such, coverage is excluded for this claim based on Exclusion 17.

Accordingly, based on the terms of the Management Agreement, the Hanover Policy Insuring Agreements and Exclusion 17, Hanover denies coverage for the claim. Hanover will not indemnify the insured for the settlement of the Claim. Although coverage is denied solely on the basis of the reasons stated above, please note that there may be other potential coverage issues for the claim.

If you have any questions concerning the above, please let us know.

Very truly yours,

Darcy L. Ibach of
LEWIS BRISBOIS BISGAARD & SMITH LLP

cc: Allison L. Chaplick, J.D.
Senior Specialty Claim Consultant
Professional Liability - Claims Department

Ms. M. Toler
Senior Vice President
Willis Group
12505 Park Potomac Avenue, Suite 300
Potomac, MD 20854

Denise Deshong
Willis Group

# EXHIBIT H



**GREENSTEIN DeLORME & LUCHS,** P.C.

1620 L STREET, N.W., SUITE 900
WASHINGTON, D.C. 20036-5605
tel (202) 452-1400  fax (202) 452-1410

www.gdllaw.com

WILLIAM C. CASANO
WCC@GDLLAW.COM

August 14, 2015

*VIA FIRST-CLASS MAIL AND EMAIL*

Darcy L. Ibach, Esq.
Lewis Brisbois Bisgaard & Smith LLP
550 West Adams Street, Suite 300
Chicago, IL  60661
Darcy.Ibach@lewisbrisbois.com

> Re:  **Claim No.:**   **Hanover Ins. 15-0051124**
> **Claimant:**   **Buckingham Jenco**
> **Insured:**   **Borger Management Inc.**
> **Policy:**   **Miscellaneous Professional Liability**

Dear Ms. Ibach:

This firm represents Borger Management, Inc. ("BMI"), the name insured in the above-referenced claim.  Your letter of July 30, 2015 to BMI advising that Hanover Insurance Company ("Hanover") is declining coverage for the claim has been referred to me for a response.  Please be advised that for the reasons stated herein, BMI objects to Hanover's coverage decision and requests that Hanover reconsider and reverse that decision.  Should the parties not be able to amicably resolve this claim, BMI will be left with no alternative but to institute a suit for declaratory judgment to establish coverage, and for damages and attorneys' fees.

Your Recitation of the Facts:

The recitation of the facts of your claim is incomplete.  This claim arose from BMI's Controller, Jennifer Dickey, being defrauded by an outside third party into believing that she was receiving written instructions from two owner principals (Marvin Jawer and Carrie Palmer of Buckingham Jenco Limited Partnership ("BJ")) of a property managed by BMI, to wire transfer funds to an account for the benefit of those owners.  The written (email) instructions turned out to be generated by a cyber-scam operated out of China.  Nonetheless, the scam was effective

7197/19/525664/1/



**GREENSTEIN DELORME & LUCHS,** p.c.
www.gdllaw.com

Darcy L. Ibach, Esq.
August 14, 2015
Page 2

enough to induce Ms. Dickey to wire the requested funds ($200,000.00) to the account for which she received wiring instructions.

Once the fraud was discovered, the real BJ principals demanded that the $200,000.00 be restored by BMI. Contrary to your letter which suggests that there was only one ground for BJ's claim, the claim was based on distinct grounds, namely: (1) under bailment law, BMI was liable because there is a presumption that loss of funds was caused by the negligence of the bailee; and (2) the loss was caused by BMI gross negligence in failing to comply with internal security procedures.

<u>Bases for Denial of Coverage:</u>

Your letter makes reference to various factors. It is difficult to discern whether such factors formed the basis of Hanover's coverage decision or not. Out of an abundance of caution, I will address each of those factors which you identified.

Your letter posits that by reimbursing BJ for the loss, BMI "operat[ed] at its own peril" and in doing so BMI jeopardized defenses to the claim, specifically a contractual defense which you contend arises from Paragraph 13 of the Management Agreement between BMI and, *inter alia*, BJ. Both of your contentions are misguided.

BMI was not acting at "its peril" or waiving defenses in restoring the $200,000.00 to BJ. Prior to making that payment, BMI, through its insurance agent, Denise DeShong of the Willis Group, emailed Hanover to seek confirmation that BMI "will not prejudice the policy by making a voluntary payment of this matter with Buckingham Jenco." That confirmation was indeed received from Hanover's coverage counsel Michael Weber by email dated July 1, 2015. You apparently have a copy of that email since you quote from it, however, you neglected to quote from the most pertinent language which is: "Hanover will not stand in the way of Tom Borger looking to mitigate his exposure by reimbursing Buckingham Jenco for their alleged loss. Mr. Borger's decision to do so is his decision and <u>will not impact our analysis of coverage.</u>" (Emphasis added). To the extent that Hanover is implying that, after stating that payment to BJ would not impact the coverage analysis, nonetheless that very payment waived defenses and prejudiced Hanover, such is disingenuous. See also, *Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 530 F. Supp. 1110 (D.D.C. 1982), *aff'd and rev'd in part*, 743 F.2d 932 (D.C. Cir. 1983) (If insurer wrongfully denies liability when its insured submits a claim, insurer may be held liable for costs of reasonable settlement reached by insured, even if insurer refused to consent to the settlement.).

Moreover, Hanover's assertion that Paragraph 13 of the Management Agreement created defenses to BJ's claim is founded, once again, on an incomplete reading of the Management



**GREENSTEIN DELORME & LUCHS,** P.C.
www.gdlaw.com

Darcy L. Ibach, Esq.
August 14, 2015
Page 3

Agreement. The <u>full</u> citation to the last paragraph of Paragraph 13 to which you cite is as follows:

> In addition, neither party shall be liable to the other for, and each
> party waives any and all rights to claims against the other party,
> any special, indirect, incidental, punitive, consequential,
> speculative or exemplary damages in connection with this
> Agreement, including, but not limited to, lost revenue or profits,
> even if a party has knowledge of the possibility of such damages.

The plain meaning of that language is that the parties are waiving the right to extraordinary damages such as punitive damages, exemplary damages, special damages, and consequential damages such as lost revenue or profits. The language scrupulously avoids mentioning compensatory damages which, of course, is what is at issue in this claim. Consistent with that interpretation, Paragraph 5.2 of the Management Agreement imposes on BMI the duty to indemnify BJ for, *inter alia*, losses sustained by BJ by reason of BMI's gross negligence. Moreover, a waiver of future gross misconduct is unenforceable as against public policy. *Moore v. Waller*, 930 A.2d 176, 179 (D.C. 2007).

Based on the foregoing, to the extent Hanover is basing its denial of coverage upon BMI paying BJ or allegedly waiving defenses, that decision is in error.

Hanover's denial of coverage based on the provisions of the Miscellaneous Professional Liability Policy ("Policy") are equally unavailing. Specifically, Hanover relies on Exclusion 17 to contend that the instant claim involved BMI's "improper use of funds or monies," and you provide case law purportedly supporting a conclusion that the exclusion applies. Neither Exclusion 17, nor the case law you cite, supports a denial of coverage.

Exclusion 17, that is, Section E(17) of the Policy provides that the Policy does not apply to claims: "Arising out of or resulting, directly or indirectly, from any actual or alleged commingling, misappropriation or improper use of funds or monies[.]" There was no "use" of the funds by BMI. Rather, BMI was defrauded out of the funds by cyber criminals. BMI can no more be deemed to have "used" the funds than a bank could have been deemed to have used cash stolen from it by a bank robber. Also, *see, e.g., Commonwealth v. Forget*, 87 Mass. App. Ct. 1111, 26 N.E. 3d 1141 (Mass. 2015) (Improper use of a credit card means use of the card by the person charged with the offense); *accord, State v. Gledhill*, 67 N.J. 565, 342 A.2d 161 (N.J. 1975). Moreover, the three cases you cite, if anything, support an interpretation that improper use of funds means the insured's use of someone else's money.

In *Murray v. Greenwich Ins. Co.*, 533, F.3d 644 (8th Cir. 2008), the insureds were real estate agents who solicited two clients to deposit money with them in a real estate venture.

Case 1:15-cv-01958-CKK Document 1-1 Filed 11/05/15 Page 100 of 110



GREENSTEIN DELORME & LUCHS, P.C.
www.gdllaw.com

Darcy L. Ibach, Esq.
August 14, 2015
Page 4

When the clients asked for a refund of their money, the agents refused and retained those funds. In addition, the policy language in *Murray* was much broader than Hanover's and excluded coverage of claims arising out of the insured's "inability or failure to pay, collect or safeguard funds held for others."

In *Hawks v. Am. Escrow, LLC*, 2012 U.S. Dist. LEXIS 43890 (N.D. Ill. 2012), the insured, a title insurance company, collected funds from clients to pay property taxes and insurance obligations, but failed to make such payments, retained the money, and failed to return the funds when it went out of business. Thus, the money was used by the insured. Moreover, as was the case with *Murray*, the policy language in *Hawks* was much broader and excluded claims arising out of failure "to properly segregate or safeguard funds."

Finally, in *Bethel v. Darwin Select Ins. Co.*, 735 F.3d 1035 (8th Cir. 2013), the insured, a title insurance company, was alleged to have engaged in a wide-ranging fraudulent scheme in which it collected funds for clients to pay off and record mortgages, then intentionally delayed paying off and recording the mortgages in order to retain and use those escrowed funds for its own purposes. Thus, the funds were used/misused by the insured itself. Also, as was the situation with the other cases you cited, the exclusion in *Bethel* was broader and applied to claims arising out of "loss, disappearance, pilferage or shortage of, or commingling or improper use of, or failure to segregate or safeguard, any client or customer funds, monies, or securities."

Since insurance contracts are written exclusively by insurers, the courts of the District of Columbia generally interpret any ambiguous provisions against the insurer and in a manner consistent with the reasonable expectations of the insured. *Richardson v. Nationwide Mut. Ins. Co.*, 826 A.2d 310 (D.C. 2003); *Travelers Indem. Co. of Ill. v. United Food & Comm'l Workers Int'l Union*, 770 A.2d 978 (D.C. 2001). See also *Love v. American Cas. Co.*, 113 U.S. App. D.C. 195, 306 F.2d 802 (D.C. Cir. 1962) (An insurance policy will be construed most favorably to the insured.). Particular scrutiny is given to exclusions. Under District of Columbia law, it is the duty of the insurer to spell out in the plainest terms any exclusionary or delimiting policy provision; having failed to do so, the words employed must be given their common meaning and all ambiguities resolved against the insurer. *Interstate Fire and Cas. Co. v. Washington Hosp. Center Corp.*, 853 F. Supp. 2d 49 (D.D.C. 2012); accord *Nationwide Mut. Ins. Co. v. Schilansky*, 176 A.2d 786 (D.C. Mun. App. 1961); *Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948 (D.C. Cir. 2001) (Unless the language of an insurance policy's exclusion is unambiguous, doubts are resolved in favor of the insured.). Such interpretation is imposed in order to give effect to a policy's dominant purpose of indemnity. *Washington Sports and Entertainment Inc. v. United Coastal Ins. Co.*, 7 F. Supp. 2d 1 (D.D.C. 1998).

Based on the facts of this case and the wording of the Policy, BMI is very confident that the courts of the District of Columbia will hold that Exclusion 17 does not absolve Hanover of

7197/19/525664/1/



**GREENSTEIN DELORME & LUCHS,** P.C.

www.gdllaw.com

Darcy L. Ibach, Esq.
August 14, 2015
Page 5

liability. Our local courts take a dim view toward insurance companies attempting to shirk their responsibilities. *Continental Casualty Co. v. Cole*, 809 F.2d 891, 895 (D.C. Cir. 1987). BMI urges Hanover to reconsider and reverse its coverage decision.

Please do not hesitate to contact me should you or your client wish to discuss this matter further. BMI reserves its right to contest any other grounds for declaration detailed in your letter of July 30, 2015.

Sincerely,

William C. Casano

cc:     Mr. Thomas Borger
        Mr. Joseph Borger
        Ms. Denise DeShong

7197/19/525664/1/

EXHIBIT I

# LEWIS
## BRISBOIS
## BISGAARD
## & SMITH LLP
ATTORNEYS AT LAW

550 West Adams Street, Suite 300
Chicago, Illinois 60661
Telephone: 312.345.1718
Fax: 312.345.1778
www.lewisbrisbois.com

DARCY L. IBACH                        September 11, 2015
DIRECT DIAL: 312.463.3339
DARCY.IBACH@LEWISBRISBOIS.COM

Via Email
William C. Casiano
Greenstein Delorme & Luchs P.C.
1620 L Street N.W.
Suite 900
Washington DC  20038

Our Matter No.: 213-637
Your Claim No.: 15-0051124
Your Insured:     Borger Management Inc.
Claimant:          Buckingham Jenco

Dear Mr. Casiano:

Please let this letter respond to your letter dated August 14, 2015. As an aside, the letter was not received in this office until one week later, as such, feel free to email me at any time to expedite our communications.  In this letter, you seek reconsideration and reversal of the denial of coverage to Borger Management Inc. ("BMI") for the claim made by Buckingham Jenco ("BJ").

In your correspondence, you note that the grounds for the pre-suit claim against the insured were two fold, (1) under bailment law, BMI was liable because there was a presumption that loss of funds was caused by the negligence of the bailee and (2) the loss was caused by BMI's gross negligence in failing to comply with internal security procedures.

You take issue with the denial of coverage on a few grounds.

First, you assert that the voluntary payment of the BJ claim was not at BMI's peril given that the email from Michael Weber provides that BMI may "mitigate his exposure". Was the insured's payment made under a reservation of rights or put into an escrow interest bearing account for the benefit of BJ until the issues of liability could be determined?  Mr. Weber did not advise the insured it was permissible to "concede" liability, he only stated it was permissible for the insured "to mitigate his exposure by reimbursing

ALBUQUERQUE • ATLANTA • BEAUMONT • BOSTON • CHARLESTON • CHICAGO • DALLAS • DENVER • FORT LAUDERDALE • HOUSTON • LA QUINTA

LAFAYETTE • LAS VEGAS • LOS ANGELES • MADISON COUNTY • NEW ORLEANS • NEW YORK • NEWARK • ORANGE COUNTY • PHILADELPHIA • PHOENIX

PORTLAND • PROVIDENCE • SACRAMENTO • SAN BERNARDINO • SAN DIEGO • SAN FRANCISCO • SEATTLE • TAMPA • TEMECULA • TUCSON • WICHITA

4850-1593-5783.1

William C. Casano
September 11, 2015
Page 2

Buckingham Jenco for their alleged loss". Further, as my earlier letter explained, Mr. Weber's email was issued prior to receipt of information that the insured later provided. Thus, to the extent you contend that Hanover acceded to an acknowledgement of liability by the insured to the claimant, it did not.

"Under the terms of the Hanover policy, in order for Hanover to be "legally obligated to pay" a claim there must be a finding of "liability" against the insured.  Please advise whether BMI made its payment under a reservation of rights pending a legal determination of its liability. We note that Ms. Palmer's personal email had been compromised prior to the June 9th improper transfer of funds at issue. Was there any attempt by BMI to negotiate its perceived liability or mitigate its damages by virtue of this fact and the fact that this occurrence was not communicated to BMI prior to its improper transfer of funds due to its actions taken following receipt of phony emails from "Ms. Palmer"?

Webber's statement in the email merely withdrew the insured's obligation to comply with Policy Condition G. Duties in the event of Claim(s) Or Potential Claims, 3. that "No insured will except at that insured's own cost voluntarily make a payment." Hanover did not withdraw the necessity of the insured establishing a legal obligation to pay.  Both Condition G.3. provides that "No insured will...assume any obligation... without our consent" and the Insuring Agreement provides that "We will pay on your behalf those sums which you become legally obligated to pay". Note, Mr. Webber's email stated, "At the same time, Hanover cannot at this time, provide Mr. Borger with the assurance he is looking for that Hanover will afford coverage under its policy.  Hanover's investigation remains ongoing". Thus, the "decision" to make a payment by Mr. Borger "is his decision" and while the decision "will not impact our analysis of coverage", the manner in which this "decision" was executed may impact coverage.

Second, you assert that what is at issue are compensatory damages. You further observe that compensatory damages are not included in the litany of damages that are referenced in paragraph 13-- Limitation of Liability of the Management Agreement. As such, you assert that Hanover's concern that the insured conceded liability and voluntarily relinquished a defense to liability under this provision is a non-starter. Even if your analysis of the Management Agreement paragraph 13 and the type of damages at issue are correct, and we do not concede that it is, the right to use bailed property depends on the contract. A bailee must (1) be given exclusive possession and control of the property and (2) knowingly accept it. Any deviations from the contractual use of the bailed property is a breach of the contract/Management Agreement.  Compensatory damages awarded pursuant to a breach of contract puts the non-breaching party in the position he would have been in had a breach not occurred.   In this context, the claim is thus seeking a "return of funds" for the breach of the contract claim. Exclusion 13 of the policy provides the policy does not apply to claims arising out of liability you assume under any contract or agreement; however this exclusion does not apply to liability that would apply in the

William C. Casano
September 11, 2015
Page 3

absence of a contract or agreement. Therefore, to the extent that what is at issue are compensatory damages arising from liability BMI assumed under the Management Agreement, Hanover reserves its rights to deny coverage based upon Exclusion 13.

Third, we disagree with your arguments that the previously cited case law does not support Hanover's analysis of Exclusion 17. We will not rehash those cases herein. The Hanover Exclusion refers to claims arising out of or resulting, directly or indirectly from any actual or alleged improper use of funds or monies. The Exclusion does not limit its applicability to merely intentional acts but is broad in nature and includes any acts whether intentional, negligent or otherwise. These types of exclusions have been widely accepted throughout the courts. See *Northland Insurance Co. v. Stuart Title Guarantee Co.,* 327 F.3d 448 (6th Cir. Michigan 2003), wherein the Sixth Circuit affirmed the district court's conclusion that the insurer had no duty to defend its insured under an Errors and Omissions policy pursuant to a handling of funds exclusion which expressly excluded any damages arising out of the commingling, conversion, misappropriation or defalcation of funds or other property. *Id.* at 451. There, the Sixth Circuit agreed with the district court's finding "that any damages sustained as a result of that ... conversion, commingling, defalcation, [or] embezzlement, ... fell within the exclusions of the policy regardless of whether the conduct was negligent or intentional." *Id.* at 456. In *Northland Insurance Co. v. Stuart Title Guarantee Co.,* the insured title insurance agency lawfully received the funds but after it was placed into the escrow account the funds were improperly thereafter used--misappropriated. Here, the insured improperly wire transferred the funds to an improper account.

When insurance policy language is clear and unambiguous, the language used must be given its usual and accepted meaning. Policy exclusions are no less contractually valid than policy grants of coverage. Under the policy's plain terms, whenever funds are alleged not to have been properly used, coverage is therefore barred under the Hanover exclusion. This conclusion has been recognized as valid by other courts analyzing similar policies. See for example, *Northland Ins. Co. v. Cailu Title Corp.,* 2001 U.S. Dist. LEXIS 2881 at *26 (W.D. MI, Feb. 2, 2001):

> A substantial amount of money is gone, and it did not walk away; it was either taken or used for improper purposes. Whether the result of dishonesty as "the claimant" Stuart initially alleged or the "bad business" practices and "mere stupidity" of [the insured's owner, Donald Sayre] Stuart now seems to suggest [record citation omitted] – Northland's policy does not cover Stuart's claim damages arising from the handling of funds at Cailu Title Corporation. Stuart's claims do not even create a duty to defend. Northland is therefore entitled to judgment as a matter of law. *Aff'd. Northland Insurance Co. v. Stuart Title Guarantee Co.,* 327 F.3d 448 (6th Cir. MI 2003) ("When an insurer has specifically and explicitly

William C. Casano
September 11, 2015
Page 4

> excluded coverage with unambiguous policy language, the expressed
> exclusions will free the insurer from any duty to defend." )

See also, *Chicago Title Ins. Co. v. Northland Ins. Co.*, 31 So. 3d 214 (Fla. Dist. Ct. App.
2010), wherein the court analyzed a handling of funds exclusion and held it barred claims
against title agent for negligently releasing funds to an attorney who misappropriated the
funds. See further, *Fidelity National Title Ins. Co. of N.Y. v. OHIC Ins. Co.*, 619 S.E.2d 704
(Ga. App. Ct. 2005), wherein OHIC issued a professional liability policy to the attorney to
cover her professional acts and omissions. Shortly after completing a closing, the attorney
discovered that her employee had absconded with client funds. Fidelity paid the client for
the loss and then sued the attorney to recoup its money. OHIC denied coverage on the
ground the loss arose out of "conversion, misappropriation, or improper commingling of
client funds." Fidelity asserted that because the attorney did not personally participate in
the conversion the claim was covered. *Id.* at 705. The appeals court rejected Fidelity's
argument and noted "that subset of criminal or dishonest misconduct which involves the
theft or misappropriation of client funds is so abhorrent and beyond the pale of ethics that it
is not covered under any circumstances." *Id.* at 708. Thus, where the misappropriation was
the source of the loss (the but for cause), coverage was excluded even though the insured
did not participate in the misappropriation and that it was the insured's negligent
supervision of his subordinate which may have facilitated the theft. *Id.* Additionally, in
*Bankers Multiple Line Ins. Co., Inc. v. Pierce*, 20 F. Supp. 2d 1004 (S.D. Miss. 1998), the
Southern District of Mississippi Court interpreted an E&O policy that had been issued to a
licensed real estate broker. The policy excluded coverage for claims "arising out of the
conversion, misappropriation, commingling, or defalcation of funds or other property." *Id.* at
1007. The insured's employee misappropriated funds. Although the plaintiff alleged a claim
against the insured for negligent supervision - and a jury found the insured liable for
negligent supervision - the court held coverage was excluded because "but for" the
employee's defalcation, the plaintiffs would not have suffered losses. *Id.* at 1007. The
plaintiffs' injuries clearly arose out of the employee's "conversion, misappropriation,
commingling, or defalcation of funds," and were therefore excluded under the
unambiguous terms of the policy. *Id.* at 1008. Likewise, here, it is undisputed that BJ's
claims against BMI arose out of the improper use of funds and but for BMI's control of the
funds and subsequent improper transmission of the funds to the wrong entity, there could
be no claim against BMI.

The crux of your argument is that the insured did not "use" the funds. Most
respectfully, she did. She used the funds when BMI accepted the deposit of the funds and
then wrongfully transmitted the funds within BMIS's control to an improper entity. The
"cyber criminals" did not invade the fund of the insured rather the insured transmitted freely
and voluntarily the funds to an improper entity. As is evident here, the elements of the
claim fit within Exclusion 17. But for the transmission by the insured of the funds to the

William C. Casano
September 11, 2015
Page 5

entity in China, there would be no claim for any damages caused by the improper use of funds. It was, after all, the insured who transmitted i.e., "used" the funds.

The point of the "use of funds" was aptly explained by a District Court in New Hampshire in *Attorneys Liability Protection Society, Inc. v. Whittington Law Associates, PLLC,* 961 F. Supp. 2d 367 (D. N.H. 2013), wherein the court noted that it was the insured's control of the funds which implicated the application of the exclusion. The policy at issue had an exclusion on a lawyer's professional liability policy that precluded coverage for " [a]ny conversion, misappropriation or improper commingling by any person of client or trust account funds or property, or funds or property of any other person held or controlled by an insured in any capacity or under any authority, including any loss or reduction in value of such funds or property" .

> What is relevant is whether the Whittington defendants controlled the funds that were misappropriated, and which are the subject of Ledyard's claim against the Whittington defendants—the funds the Whittington defendants instructed Ledyard to wire to the Japanese bank account.

> ***The Whittington defendants' "directing influence" or "power over" the funds in question is evident from the fact that the bank wired those funds at their direction. Further, the clause refers to funds controlled by the Whittington defendants "in any capacity or under any authority," a clause broad enough to encompass the Whittington defendants' status as account holders at Ledyard. Indeed, the Whittington defendants' authority, as account holders, to direct the bank how to disperse the funds at issue was the linchpin on which the scam itself turned; if the Whittington defendants had no such authority, the scam could not have been accomplished.

> ****

> The Whittington defendants finally protest that "no law firm purchasing professional liability insurance would expect that permitting its client trust account to be pilfered would not be covered." [citations omitted]. It suffices to say in response that if the plain and unambiguous language of the insurance policy excludes coverage for those acts, the insured law firm should expect just that. That is the case here, and ALPS is entitled to summary judgment in its favor.

Under District of Columbia law, the language of Exclusion 17 must be given its "plain" meaning. *Carle Capitol Group v. Fireman's Fund Ins. Co.,* 877 F.2d 78, 81 (D.C. Cir. 1989). Courts have further recognized that "exclusion provisions must be enforced even if the insured did not perceive how the exclusion operated, otherwise courts will find themselves in the undesirable position of rewriting insurance policies and reallocating assignment of risks between insurer and insured." *Capitol Specialty Ins. Corp., v.*

LEWIS BRISBOIS BISGAARD & SMITH LLP • www.lewisbrisbois.com

William C. Casano
September 11, 2015
Page 6

*Sandford Whittels and Heisler, LLP*, 793 F. Supp. 2d 399, 409 (D.D.C. 2011). (Granting summary judgment in favor of professional liability insurer based on the unambiguous language of the policy).  Accord, *Silver v. Am. Safety Indem. Co.*, 31 F. Supp. 3d 140, 148 (D.D.C. 2014); *Burk & Reedy, LLP v. Am. Guar. & Liab. Ins. Co.*, 2015 U.S. Dist. LEXIS 35878 (D.D.C. Mar. 23, 2015).

To interpret the policy language as you suggest would be contrary and an unreasonable approach and would have the effect of rewriting the Hanover policy issued to BMI.  The term "use" is according to Webster's Second New College Dictionary 717 (Third Edition 2005), defined to mean in part "the act of using something", "the state of being used", "a way in which something is or can be used".  Webster's defines the term "improper" in part as "not correct", "not following rules of acceptable behavior", "not suitable for the situation", "not appropriate".  Clearly, what was done in this instance was not suitable for the situation, not an appropriate transmission of funds.  Moreover, Exclusion 17 also excludes claims for "misappropriation."  In *In Re Pleshaw*, 28 3rd 169, 173 (D.C. 2010) the court defined "misappropriation" as "any unauthorized use of client funds entrusted to [an attorney] including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom".  Here, you have identified the claim against the insured as the loss of use  of funds caused by the negligence of the bailee and  gross negligence of the insured to comply with internal security procedures. Under the District of Columbia law, there was a misappropriation, i.e. an unauthorized use of client's funds entrusted to the insured.  A straightforward application of  Exclusion 17 under District of Columbia law compels the conclusion that the claim arises out of the excluded improper use of funds or misappropriation of client funds and the insurer has no coverage obligation based on Exclusion 17.

Furthermore, in *Navigator's Ins. Co. v. Bailer & Jackson, PLLC*, 888 F. Supp. 2d 55 (D.D.C. 2012), Navigators issued a professional liability policy to a law firm and sought to exclude from coverage a claim based upon an exclusion which precluded coverage for damages or expenses with respect to any claim based on, arising out of the insured's care, custody or control or out of the misappropriation of or failure to give an account of any asset in the insured's care, custody or control.  To resolve whether Exclusion K in the Navigator's policy precluded coverage, the court asked two questions, first, does the complaint allege  loss, destruction or diminution of value of assets or alternatively misappropriation or failure to account for assets? and second were the assets in the care, custody and control of the insured?  The court concluded there could be little doubt that the allegations fell within the scope of Exclusion K as the complaint alleged that monies were deposited into the firm's account and were misappropriated by the firm and at least one partner instead of being used for legitimate investments.  The court noted Exclusion K encompasses schemes such as this and therefore found the policy did not require

William C. Casano
September 11, 2015
Page 7

coverage for the claim. *Id.* at 62-3. Consistent with this analysis, Hanover concludes that Exclusion 17 in the Hanover policy precludes coverage for BJ's claim.

Additionally, numerous courts have determined that "misdelivery" of bailed goods constitutes a "conversion" - which is a type of "improper use of funds" excluded by Exclusion 17.

> The defendant, in this instance, did not deliver the goods to the person so entitled. The defendant delivered the goods to the wife of the person "entitled" to receive. What this court said in *Treadwell Ford v. Wallace*, 49 Ala. App. 308, 271 So. 2d 505 (1973) *Ford v. Wallace*, 49 Ala. App. 308, 271 So. 2d 505 (1973), in quoting from *Doyle v. Peerless Motor Car Co. of New England*, 226 Mass. 561, 116 N.E. 257 (1917), is applicable in this case. "'A delivery to an unauthorized person is as much a conversion as would be a sale of the property, or an appropriation of it to the bailee's own use. In such cases, neither a sincere and apparently well founded belief that the tortious act was right, nor the exercise of any degree of care, constitutes a defense even to a gratuitous bailee.'" 49 Ala. App. at 314, 271 So. 2d at 510.

*Teague Bros. Transfer & Storage Co. v. Kinloch*, 441 So. 2d 968, 969 (Ala. Civ. App. 1983) (emphasis added). See also, *Boiseau v. Morrissette*, 78 A.2d 777, 780 (Mun. Ct. App. D.C. 1951) ("Where a bailee for hire wrongfully refuses to deliver possession to the owner and exercises dominion over the property to the owner's detriment, he is liable for the tort of conversion. "); *Jacobson v. Belplaza Corp.*, 80 F. Supp. 917, 919 (D.N.Y. 1948) ("Wrongful delivery was a breach of its contract, (*Dalton v. Hamilton, Hotel Operating Co.*, Inc., 242 N.Y. 481, 487-489, 152 N.E. 268) and amounted to a conversion of the coat."). "The essence of conversion is an interference with another's property that is so substantial as to justify treatment as a forced sale of the property. W. Prosser, Law of Torts 80-81 (4th ed. 1971)." *Horne v. Francis I. Du Pont & Co.*, 428 F. Supp. 1271, 1275 (D.D.C. 1977); See also, *McNamara v. Picken*, 950 F. Supp. 2d 193, 195-196 (D.D.C. 2013).

Moreover, there is a key phrase prefacing Exclusion 17 "arising out of, or resulting, directly or indirectly". This reflects that any type of improper use of funds is simply not a risk underwritten by the policy. Indeed the phrase "arising out of" is recognized under the District of Columbia insurance law as broad in scope. The insured has ignored the breath of the exclusion at issue. The exclusion makes plain that Hanover is not assuming any risk associated with a claim "arising out of" an improper use of funds or monies whether styled as a bailee claim for negligence or a loss due to the gross negligence of the insured to adhere to internal security procedures. Neither a defense nor an indemnity obligation is owed for any claim based upon or arising out of a claim directly or indirectly involved in a claim for the improper use of funds or monies. This is irrespective of whether the funds were wrongly wired transferred based upon a cyber attack or a misrepresentation within an

William C. Casano
September 11, 2015
Page 8

email or the failure to adhere to company security procedures.  Under any theory, this claim arises out of an improper use of funds and/or misappropriation of funds which is otherwise barred from coverage.

For the reasons explained, Hanover continues to assert a reservation of rights on the bases set forth herein and in the earlier correspondence.

Very truly yours,

Darcy L. Ibach of
LEWIS BRISBOIS BISGAARD & SMITH LLP

cc. Allison L. Chaplick, J.D.
Senior Specialty Claim Consultant
Hanover Claims Department
Professional Liability

---